922 A.2d 1252

RONALD A. MACKINNON, PLAINTIFF–APPELLANT, v. ERIKA
MACKINNON, DEFENDANT–RESPONDENT.

Argued May 1, 2007—Decided June 11, 2007.

*Michele E. D'Onofrio* argued the cause for appellant (*DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer,* attorneys; *Krista L. Haley,* on the briefs).

*Christina M. Reger* argued the cause for respondent (*Bazelon Less & Feldman,* attorneys; *Ms. Reger and A. Richard Feldman,* on the brief).

Chief Justice ZAZZALI delivered the opinion of the Court.

After fifteen years of marriage, Erika MacKinnon, a Japanese citizen, and Ronald MacKinnon divorced. Claiming that she is isolated and unhappy in the United States, Mrs. MacKinnon requested permission, pursuant to *N.J.S.A.* 9:2–2, to return to her home country with the couple's minor daughter Justine. The trial court granted the request, finding that Mrs. MacKinnon had a good-faith reason for the move and that relocation would serve the daughter's best interests. The Appellate Division affirmed.

In this appeal, we must determine whether the standard for removal of minor children of divorce, established in *Baures v. Lewis,* 167 *N.J.* 91, 770 *A.*2d 214 (2001), applies when a custodial parent seeks to relocate a child to a foreign nation. Because the *Baures* factors are sufficiently flexible to accommodate the intricacies of international removal and because that standard promotes the best interests of the child, we hold that *Baures* applies to the international removal context. In doing so, we affirm the trial court's application of those factors to the present circumstances and its decision to grant the removal request.

I.

A.

Erika MacKinnon met Ronald MacKinnon in 1990 when Mr. MacKinnon was stationed in Okinawa as a member of the United States Marine Corps. After a year of courtship in Japan, and following Mr. MacKinnon's discharge from the military for drug use, the couple married in the United States in 1991. Although she became a permanent resident of the United States during the marriage, Mrs. MacKinnon never obtained United States citizenship and remains a citizen of Japan. Mr. MacKinnon states that both he and his wife considered the move to New Jersey to be permanent, but Mrs. MacKinnon explains that she believed that if it did not "work out" in the United States, the couple would return to Japan.

Although Mrs. MacKinnon did not speak English when she first came to the United States, she learned the language, in part, by attending English-as-a-second-language classes at a community college. She worked part-time as a waitress in a Japanese restaurant from 1993 until 1996, and then obtained full-time employment as an administrative assistant at the Edison office of a Japanese company. After Justine was born in 2000, Mrs. MacKinnon stopped working at the company to stay home and care for the child. However, the marriage deteriorated, and in 2002 Mr. MacKinnon left Mrs. MacKinnon. After his separation from Mrs. MacKinnon, Mr. MacKinnon usually visited Justine once every week or two for brief periods of time. Since 2003, Mr. MacKinnon has resided with his girlfriend, with whom he has a one-year-old son. Despite a prior history of intermittent drug and alcohol abuse, Mr. MacKinnon has remained drug-free and sober for several years.

Mrs. MacKinnon remained the child's primary caregiver and eventually returned to work—babysitting, housekeeping, and providing in-home massage therapy. She earns approximately $900 a month from those three jobs, but continues to devote significant time to her child care responsibilities. Mr. MacKinnon, a foreman for a construction company, is an hourly employee and earns $60,000 per year. He also solicits and receives significant financial support from his mother.

In November 2004, two years after the couple's separation, Mr. MacKinnon filed a divorce complaint. Mrs. MacKinnon filed a counterclaim in January 2005 requesting permission to remove Justine to Japan pursuant to *N.J.S.A.* 9:2–2. Mrs. MacKinnon asserted that relocation to Japan would enable her to earn more money, enjoy a lower cost of living, and provide a better life for herself and Justine. Under the 2006 judgment of divorce, Mrs. MacKinnon is entitled to approximately $1,000 per month in child support and $500 per month in alimony. Also, pursuant to a 2005 *pendente lite* order, Mr. MacKinnon has parenting time with

Justine every weekend from 6:00 p.m. on Friday to 6:00 p.m. on Saturday.

At the hearing on the removal request, Mrs. MacKinnon testified that she has no family and few friends in the United States. She hopes to return to Okinawa, where she has a strong support network composed of many friends and family. Mrs. MacKinnon also noted that job opportunities for her are plentiful and significantly more lucrative in Japan than in New Jersey. She stated that, in Okinawa, she could earn $18 to $20 an hour teaching English as a second language, $12 to $14 per hour translating Japanese documents into English, and $8 to $12 an hour performing administrative work. She also testified that she could work temporarily as a massage therapist in a relative's spa while she secured permanent employment. Mrs. MacKinnon estimated that she could earn $20,000 a year in Japan, enough to sustain a comfortable middle-class lifestyle.

Mrs. MacKinnon also explained that her family can provide care for Justine. Specifically, Mrs. MacKinnon's mother, who is retired, can tend to Justine while Mrs. MacKinnon works, and Mrs. MacKinnon's sister, who lives five minutes from their mother and stays at home with her two children, can also provide child care assistance. Importantly, Justine is well acquainted with her Japanese family, and, according to testimony, the family has established strong bonds with Justine. Mrs. MacKinnon and Justine visited their Japanese relatives annually from 2000 to 2004, with each visit lasting two to four months. During her time in Japan, Justine learned about Japanese culture from her family and attended pre-school. According to Mrs. MacKinnon, if they relocated, Justine would receive a quality education and could study English while attending a public school in Japan where Mrs. MacKinnon's father was formerly the principal.

Mrs. MacKinnon proposed a visitation schedule for Mr. MacKinnon that included parenting time in both Japan and the United States. Pursuant to the plan, Justine would travel to the United States with Mrs. MacKinnon during Justine's six-week summer

break from school. Mrs. MacKinnon would share the cost of Justine's airfare with Mr. MacKinnon, pay for all of her own airfare, and stay at her pastor's house in New Jersey while Justine stayed with Mr. MacKinnon. Additionally, Mr. MacKinnon would travel to Japan to be with his daughter for one or both of her two-week winter and spring vacations. Mrs. MacKinnon also would install the necessary equipment to permit Justine and her father to communicate via video phone. However, Mr. MacKinnon testified that, because he is an hourly worker with no allotted vacation time and because he has additional parental duties to his son, travel to Japan for extended periods of time and prolonged vacations with Justine during her trips to the United States would create substantial financial and familial hardships. He indicated that he could take two weeks of vacation when Justine visited in the summer, but was unsure whether he could afford to miss work any other time of year.

The court-appointed expert, Dr. Charles Most, a family psychologist, interviewed Mr. and Mrs. MacKinnon, Justine, Mr. MacKinnon's live-in girlfriend, and the girlfriend's twelve-year-old son from a previous relationship. Dr. Most testified that Mrs. MacKinnon exhibited an "intensely fearful" and "depressed" mood and has had difficulty establishing close relationships in the United States. He opined that Mrs. MacKinnon is a "submissively dependent woman" who is "vulnerable if separated from those who provide her support." Dr. Most assessed that she "would be less scared, less isolated, and [better] able to make greater social contacts" living close to her family in Japan, but, if not permitted to return to Japan, her eventual depression "would negatively impact" Justine. According to Dr. Most, Mrs. MacKinnon's "mental health would be best served by returning to her home country."

Dr. Most further testified that Justine, a bilingual dual citizen of Japan and the United States, is an extroverted child capable of handling the adjustment of relocating to Japan. Dr. Most concluded that although cessation of all contact with her father would

negatively affect Justine, denial of Mrs. MacKinnon's request to remove Justine to Japan would cause Justine greater harm than a change in contact with her father because "Justine's mental health is more directly related to [that of her mother]." Dr. Most recommended approval of Mrs. MacKinnon's request for removal and concluded that "both parties love their daughter very much and would comply" with a court-ordered visitation plan.

## B.

Applying the *Baures* factors, Judge Rubin concluded that Mrs. MacKinnon established, by a preponderance of the evidence, that she possessed a good-faith reason for the move and that Justine's best interests would be served by the relocation. In reaching that conclusion, the trial court found that Mrs. MacKinnon was unhappy in the United States, exhibited symptoms of depression, and, in contrast, likely would flourish in a supportive familial environment in Japan. The court further observed that Mrs. MacKinnon would enjoy a reduced cost of living in Japan and would not have difficulty finding employment to support herself and her daughter. Regarding Justine, the court found that she "appears happy" with her Japanese family, is "comfortable both here in the United States and in Japan," and would adjust well to life abroad. The court recognized that Justine would have access to an education "at least as good as [that in] the United States," as well as health care and leisure opportunities comparable to those enjoyed in New Jersey. Finally, the court accepted Dr. Most's conclusion that Mrs. MacKinnon would "foster a positive relationship" between Justine and her father.

Specifically, the court addressed Mr. MacKinnon's fear that because Japan is not a nation that is party to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention), he would have no redress under United States, Japanese, or international law if Mrs. MacKinnon wrongfully withheld visitation. The Hague Convention, a multilateral treaty with seventy-nine contracting nations, seeks "to secure the prompt

return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Hague Convention on the Civil Aspects of International Child Abduction* art. 1, Oct. 25, 1980, *T.I.A.S.* No. 11,670, 19 *I.L.M.* 1501. Although the trial court acknowledged that because of Japan's status as a non-party to the Hague Convention, Mr. MacKinnon may have limited remedies if Mrs. MacKinnon violated the court's order, the court rejected the argument that such a predicament should *per se* bar international removal of children to non-party nations like Japan. Instead, guided by *Abouzahr v. Matera–Abouzahr,* 361 *N.J.Super.* 135, 824 *A.*2d 268 (App.Div.2003), the court weighed that consideration against all of the other evidence presented and concluded:

> While Japanese law may not provide [Mr. MacKinnon] with a practical remedy, if [Mrs. MacKinnon] does not return Justine, or doesn't allow visitation, and despite the fact that [Mrs. MacKinnon] is Japanese, that her roots are there and her family is there, ... [Mr. MacKinnon], in view of [Mrs. MacKinnon's] past conduct, has no justifiable basis for a genuine fear that [Mrs. MacKinnon] will not return Justine or refuse visitation.

Although the trial court found Mr. MacKinnon "sincere," the court found his fear that he would "lose his daughter" to be unfounded. Observing that Mrs. MacKinnon obeyed all previous court orders, the court considered the possibility that Mrs. MacKinnon would abscond with Justine "an acceptable risk under the circumstances." The trial court also found that Mrs. MacKinnon had submitted a visitation plan that allowed Mr. MacKinnon to have "substantial quality time" with Justine three times annually. Ultimately, the court concluded that the move would be in Justine's best interests because Justine would benefit from her mother's increased "stability and happiness" while retaining sufficient contact with her father.

The trial court granted Mrs. MacKinnon's removal request. In its order permitting Justine's removal to Japan, the court imposed several conditions: (1) New Jersey will have sole jurisdiction over the child, and each party will be required to submit to the *in personam* jurisdiction of the court; (2) parenting time for Mr.

MacKinnon will occur three times per year in New Jersey; (3) Mrs. MacKinnon will be solely responsible for Justine's travel costs to and from New Jersey; (4) Mrs. MacKinnon must permit and finance reasonable telephone contact and webcam communication between Justine and Mr. MacKinnon; (5) Mr. MacKinnon must allow Mrs. MacKinnon, or another suitable adult, to tutor Justine in Japanese for a two-hour period twice during the summer and once during the spring and winter visitation periods; and (6) Mr. MacKinnon must allow Mrs. MacKinnon to have reasonable telephone contact with Justine while she is in New Jersey. Additionally, at the request of Mr. MacKinnon's counsel, the trial court agreed to hold Justine's United States and Japanese passports pending appeal.

In an unpublished, per curiam opinion, the Appellate Division affirmed the trial court's order granting Mrs. MacKinnon permission to relocate to Okinawa with Justine. The Appellate Division found that the trial court correctly applied the *Baures* factors to the circumstances presented. The panel concluded that "the move to Japan will not be inimical to Justine's interests" and that the trial court's ruling was "adequately supported by the evidence in the record."

We granted Mr. MacKinnon's petition for certification, continued the stay entered by the Appellate Division pending disposition of this appeal, and ordered accelerated consideration of this matter. 190 *N.J.* 389, 921 *A.*2d 444 (2007).

## II.

### A.

Under *N.J.S.A.* 9:2-2, which governs divorced parents' ability to remove their minor children from New Jersey, minor children "shall not be removed out of [the State] . . . without the consent of both parents, unless the court, *upon cause shown,* shall otherwise order." (Emphasis added). By enacting *N.J.S.A.* 9:2-2, the Legislature intended to preserve the right of the non-custodial

parent and the child to maintain their familial relationship. *Cooper v. Cooper,* 99 *N.J.* 42, 50, 491 *A.*2d 606 (1984).

In *Cooper,* we balanced the right to retain the familial relationship with the custodial parent's "freedom to seek a better life" by relocating. *Id.* at 50, 55, 491 *A.*2d 606. In doing so, we held that "the best interests of a child are so interwoven with the well-being of the custodial parent [that] the determination of the child's best interest requires that the interests of the custodial parent be taken into account." *Id.* at 54, 491 *A.*2d 606.

Several years later, we revisited *Cooper* and reaffirmed the principle that the focus of any inquiry under *N.J.S.A.* 9:2–2 should be whether removal of the child would adversely impact the child's best interests or the non-custodial parent's visitation rights. *Holder v. Polanski,* 111 *N.J.* 344, 352, 544 *A.*2d 852 (1988). We also established a two-prong test that requires a custodial parent seeking to relocate with the marital child to present a good faith reason for the proposed move and to demonstrate that the move would not "interfere with the best interests of the [child] or the visitation rights of the non-custodial parent." *Id.* at 349, 352–53, 544 *A.*2d 852.

In *Baures, supra,* we subsequently clarified the importance of visitation rights in the legal standard set forth in *N.J.S.A.* 9:2–2. 167 *N.J.* at 97–98, 770 *A.*2d 214. In addition to a prima facie showing of "a good faith reason for the move and that the child will not suffer from it," *id.* at 118, 770 *A.*2d 214, the custodial parent must present a visitation proposal as "an important element of proof on the ultimate issue of whether the child's interest will suffer from the move," *id.* at 122, 770 *A.*2d 214. We observed that although a parent's interests are significant in the removal context, our commitment is to the best interests of the child. *See id.* at 116, 770 *A.*2d 214. Accordingly, changes in visitation alone cannot serve as an "independent basis" for denying removal. *Id.* at 117, 770 *A.*2d 214. Nonetheless, a non-custodial parent may present evidence that, because of "particular reasons" and "unique facts surrounding" the relationship with the child, the new visita-

tion scheme would not sustain the relationship. *Id.* at 120, 770 A.2d 214.

In light of those principles, we enumerated twelve factors for courts to consider in assessing whether to permit removal of a minor child:

(1) the reasons given for the move; (2) the reasons given for the opposition; (3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move; (4) whether the child will receive educational, health and leisure opportunities at least equal to what is available here; (5) any special needs or talents of the child that require accommodation and whether such accommodation or its equivalent is available in the new location; (6) whether a visitation and communication schedule can be developed that will allow the noncustodial parent to maintain a full and continuous relationship with the child; (7) the likelihood that the custodial parent will continue to foster the child's relationship with the noncustodial parent if the move is allowed; (8) the effect of the move on extended family relationships here and in the new location; (9) if the child is of age, his or her preference; (10) whether the child is entering his or her senior year in high school at which point he or she should generally not be moved until graduation without his or her consent; (11) whether the noncustodial parent has the ability to relocate; (12) any other factor bearing on the child's interest.

[*Id.* at 116–17, 770 A.2d 214.]

We cautioned that "not all factors will be relevant and of equal weight in every case." *Id.* at 117, 770 A.2d 214. Further, courts must remain cognizant of the underlying precepts that the custodial parent seeking removal must have a good-faith motive and that the move must not be inimical to the child's best interests. *Id.* at 122, 770 A.2d 214.

## B.

■ In seeking reversal of the trial court's ruling, Mr. Mac-Kinnon concedes that *Baures* "provides a good starting point" for international removal disputes. However, because "the implications of an international removal are so distinguishable" from interstate removal, Mr. MacKinnon contends that "stricter criteria" are required to address the distinctive issues implicated by foreign and international law and to safeguard the parental rights of the non-removing parent.

The interstate and international removal contexts involve the same interests. In both situations, the custodial parent has an interest in self-determination and maintains the "freedom to seek a better life." *Id.* at 110, 770 *A.2d* 214 (quotation omitted). That interest is critical to a court's review of international disputes because the custodial parent's "needs and desires can be viewed as intertwined with the child's interests" regardless of the continent. *Id.* at 115, 770 *A.2d* 214. Similarly, the non-custodial parent retains an interest in sustaining a familial relationship with the child, and international removal does not preclude the parent from continuing that relationship. Lastly, regarding interstate removal, the State is primarily concerned with the "ultimate issue of whether the child's interest will suffer from the move." *Id.* at 122, 770 *A.2d* 214. The same "ultimate issue" is at the heart of international removal. The interests remain the same and, therefore, the *Baures* test appropriately balances the concerns implicated in either situation.

Because the *Baures* factors can accommodate distinctions between the interstate and international removal contexts, the standard also provides flexibility to courts determining the appropriateness of foreign removal. For example, the first and third *Baures* factors, which bear directly on whether the custodial parent is motivated by a good-faith reason for the move as opposed to a desire to thwart visitation, apply regardless of what border the child crosses. *Id.* at 116, 770 *A.2d* 214. The second, sixth, seventh, and eleventh factors address the removal's impact on the non-custodial parent's rights and can account for unique aspects of international visitation. *Id.* at 116–17, 770 *A.2d* 214. The fourth, fifth, eighth, ninth, and tenth factors consider any potential harm to the child, utilizing language that can accommodate international variables. *Ibid.* Additionally, courts can employ the twelfth factor—a catch-all that considers "any other factor bearing on the child's interest"—to sufficiently address other concerns implicated by international removal, such as Hague Convention membership, cultural and social concerns, feasibility of

visitation, and enforceability of parental rights. *Id.* at 117, 770 A.2d 214.

Thus, the principles underlying *N.J.S.A.* 9:2–2 and the legal standard established in *Baures* are equally applicable to requests for international and interstate removal. *Baures* and its decisional antecedents emphasize that the standard addresses the rights of the custodial and non-custodial parent and the best interests of the child. Those factors, and the corollary balancing of those considerations, remain constant whether the removal is interstate or international. Most important, because "not all [*Baures*] factors will be relevant and of equal weight in every case," *id.* at 117, 770 A.2d 214, the *Baures* standard can adapt to, and address the peculiarities of, the international removal context.

### C.

Admittedly, however, international removal is more complex than interstate removal and requires trial courts to consider other factors. Courts called on to decide international removal disputes should therefore apply *Baures* expansively to adapt to international circumstances.

For example, in *Abouzahr, supra,* the Appellate Division conducted a wide-ranging analysis when faced with the analogous situation of the temporary removal of a child of divorced parents to a foreign country. 361 *N.J.Super.* at 138, 824 A.2d 268. There, the custodial mother appealed the denial of her request to prevent the non-custodial father from removing their daughter to Lebanon during his summer visitation time. *Id.* at 147–51, 824 A.2d 268. The Appellate Division indicated that although the mother's fear of abduction should "be given careful consideration," *id.* at 152, 824 A.2d 268, "fear alone is not enough to deprive a non-custodial parent of previously agreed upon visitation," *id.* at 155, 824 A.2d 268.

The panel held that courts should consider,

among other things, the domicile and roots of the parent seeking such visitation, the reason for the visit, the safety and security of the child, the age and attitude of

the child to the visit, the relationship between the parents, the propriety and practicality of a bond or other security and the character and integrity of the parent seeking out-of-country visitation as gleaned from past comments and conduct.

[*Id.* at 156, 824 *A.*2d 268.]

In particular, the Appellate Division found that the "danger of retention of a child in a country where prospects of retrieving the child and extraditing the wrongful parent are difficult, if not impossible, is a major factor for a court to weigh." *Ibid.* Nevertheless, the panel concluded that a bright-line rule prohibiting visitation to a country not a signatory to the Hague Convention would "unnecessarily penalize a law-abiding parent and could conflict with a child's best interest." *Id.* at 155, 824 *A.*2d 268. Although *Abouzahr* did not address the effects of international removal on the visitation rights of a non-custodial parent, we nonetheless endorse its consideration of all factors affecting cross-border disputes.

In addition to reviewing the variety of concerns affecting the international removal of a minor child of divorce, trial courts must consider the question of the enforceability of visitation and other court orders in the international removal context. Although a foreign nation's Hague Convention status is a pertinent factor, it is by no means dispositive. In future proceedings, when a parent raises concerns regarding enforceability, the trial court should pursue alternative solutions to such problems by, for example, encouraging the parties to obtain appropriate orders in the foreign nations or enter into contractual agreements, enforceable overseas, governing visitation arrangements.

## III.

In view of our findings that *Baures* applies to requests for international removal and that the *Baures* standard is flexible enough to accommodate the unique aspects of international removal discussed in *Abouzahr,* we now examine the trial court's application of the *Baures* standard to the circumstances of this appeal. In doing so, we are mindful that "[a] reviewing court should

uphold the factual findings undergirding the trial court's decision if they are supported by adequate, substantial and credible evidence on the record." *N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007) (quotation and quotation marks omitted). Even "where the focus of the dispute is ... alleged error in the trial judge's evaluation of the underlying facts" and their implications, and thus "the traditional scope of review is expanded," we will nonetheless accord deference to the trial court's findings unless they "went so wide of the mark that a mistake must have been made." *Ibid.* (internal quotations and citations omitted). That deference is especially appropriate "when the evidence is largely testimonial and involves questions of credibility." *Cesare v. Cesare*, 154 *N.J.* 394, 412, 713 *A.*2d 390 (1998) (quotation omitted).

The first and third *Baures* factors bear directly on whether the custodial parent is acting on a good-faith basis for the relocation as opposed to a desire to thwart visitation. The trial court found that Mrs. MacKinnon provided legitimate reasons for moving to Japan—to benefit from her family's financial and emotional support, to pursue improved employment prospects, and to enjoy a lower cost of living. That conclusion is supported by evidence addressed at the hearing concerning Mrs. MacKinnon's meager income and lack of a support system in the United States, the trial court's credibility assessments of her testimony, and the opinion of Dr. Most, the court-appointed expert, that Mrs. MacKinnon has "a better chance to make greater social contacts [in Okinawa] ... because she would feel more comfortable and supported there."

The second, sixth, seventh, and eleventh factors address the removal's impact on the non-custodial parent's rights. We recognize, as did the trial court, that the sixth factor—"whether a visitation and communication schedule can be developed that will allow the non-custodial parent to maintain a full and continuous relationship with the child"—is particularly important when considering a child's removal to a distant place. That factor has added importance because transportation and communication costs

generally increase with distance, and long distances separating the non-custodial parent and the child limit the frequency with which that familial relationship can be nurtured.

Nonetheless, international removal is not a de facto bar to a non-custodial parent's continuing and healthy relationship with a child. Rather, it is an essential issue for the trial court to consider in applying the twelve factors to a request for international removal. We observed in *Baures, supra*, that "the ability to communicate over long distances has been revolutionized during the years since the first removal cases [and][c]omputers, technology and competitive long-distance rates ... essentially have changed the way people connect with each other when they are apart." 167 *N.J.* at 105, 770 *A*.2d 214 (citations omitted). Those technological advances, which improve daily, facilitate both interstate and international communication. The increased ease and convenience of international travel mitigate concerns about the difficulty of maintaining visitation schedules across oceans.

Further, as we observed in *Baures,* "a mere change, even a reduction, in the noncustodial parent's visitation is not an independent basis on which to deny removal." *Id.* at 117, 770 *A*.2d 214. The visitation plan approved by the trial court, although a change from the current, domestic visitation schedule, affords Mr. MacKinnon approximately ten weeks a year with his daughter, sufficient time to sustain their relationship. The plan also provides for multiple means of electronic communication between Mr. MacKinnon and Justine. The record contains ample evidence that the visitation schedule is sufficient to foster a healthy relationship between Justine and her father.

The trial court also found no evidence to support Mr. MacKinnon's fear that Mrs. MacKinnon would attempt to alienate him from his daughter or undermine his exercise of joint legal custody or visitation. Mrs. MacKinnon has faithfully returned to the United States with Justine after each trip to Japan, has previously followed court orders, and acknowledged in her testimony that Mr. MacKinnon and Justine love each other. According to Dr. Most,

Mrs. MacKinnon "has the capacity to foster a very positive relationship" between father and daughter and is not "a person who will defy rules."

The fourth, fifth, eighth, ninth, and tenth factors consider potential harm to the child. The trial court found that Justine could receive a comparable education, quality health care, and considerable leisure opportunities in Japan. The court also observed, in accordance with Dr. Most's opinion, that Justine can readily adapt to living in Japan due, in part, to her familiarity with the country, her relatives there, and her knowledge of the language. In addition, the trial court found that Mrs. MacKinnon is Justine's primary parental figure and Justine's mental health is "directly related" to that of her mother. Finally, Dr. Most testified that Justine would not be significantly harmed by an altered visitation schedule. As long as Justine "has regular communication and contact with [her father] that is extensive enough to sustain their relationship, [her] interests are served." *Id.* at 107, 770 *A.*2d 214. Thus, the trial court found that Justine would not suffer from the removal, and that finding is based on substantial credible evidence in the record.

We find no merit in Mr. MacKinnon's contention that Japan's status as a non-Hague Convention country should automatically defeat Mrs. MacKinnon's request for international removal. The trial court properly assessed Japan's non-Hague Convention status as a consideration under the *Baures* framework, and we afford that finding substantial deference. We appreciate Mr. MacKinnon's concerns about the enforceability of New Jersey visitation orders in Japan and agree with the trial court that it is in Justine's best interests to maintain a familial relationship with both her mother and her father. To be sure, Mr. MacKinnon may have limited remedies if Mrs. MacKinnon attempts to deny him access to Justine for court-ordered visitation time. *See* U.S. Department of State, *International Parental Child Abduction: Japan,* http://travel.state.gov/family/abduction/country/country_501.html (last visited June 7, 2007) (noting that foreign parents

seeking enforcement of visitation rights are disadvantaged in Japanese courts). Nonetheless, we have no reason to believe that Mrs. MacKinnon would choose that ill-advised path. The trial court found Mrs. MacKinnon to be "credible" and "sincere" in her desire to facilitate Mr. MacKinnon's continued parental relationship with Justine, and the record indicates that Mrs. MacKinnon has obeyed all court orders. We reiterate that "fear alone is insufficient to deprive" a custodial parent of the ability to relocate with a child if the parent has a good-faith reason for the move and has shown that the child will not suffer from it. *See Abouzahr, supra,* 361 *N.J.Super.* at 155, 824 *A.*2d 268.

In sum, both the trial court and the Appellate Division agreed that Justine's best interests would be served by relocation to Japan. The trial court applied the *Baures* standard to the proposed removal, a standard that we find appropriate in the international removal context. The court's well-reasoned judgment was buttressed by "adequate, substantial and credible evidence," *M.M., supra,* 189 *N.J.* at 279, 914 *A.*2d 1265 (quotation omitted), and therefore must stand.

### IV.

In addition to challenging the merits of the trial court's decision to grant removal, Mr. MacKinnon advances a litany of other arguments on appeal. We agree with the Appellate Division that those arguments are "clearly without merit." *See R.* 2:11–3(e)(1)(E).

### V.

The removal standard in New Jersey "accords particular respect to the custodial parent's right to seek happiness and fulfillment," guarantees "regular communication and contact [between the non-custodial parent and the child] of a nature and quality to sustain that relationship," and "incorporates a variation on a best interests analysis by requiring proof that the child will not suffer from the move." *Baures, supra,* 167 *N.J.* at 97, 770 *A.*2d 214.

That standard is infused with flexibility and is able to accommodate a wide range of concerns implicated by international removal of a minor child of divorce.

As technology and transportation improve, our world becomes smaller. That continued evolution, paradoxically, will foster both improved international familial relationships and increased international familial disputes. Nonetheless, as evidenced by the present appeal, the broad *Baures* factors permit our courts to flexibly and properly address the myriad, nuanced issues created by family ties that cross international boundaries. By holding that the twelve-factor *Baures* standard applies to both the interstate and international removal contexts, we afford our trial courts the means to adapt to the variety of unique circumstances presented in family law proceedings.

Because we conclude that the trial court properly applied the correct standard to Mrs. MacKinnon's request for international removal of Justine and that its decision to grant the request is supported by the record, we affirm.

*For affirmance*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.