**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1973-16T4

R.R.,

    Plaintiff-Appellant,

v.

J.M.,

    Defendant-Respondent.

_____

R.R,

    Plaintiff,

v.

B.R.,

    Defendant.

_____

Argued May 7, 2018 — Decided June 15, 2018

Before Judges Ostrer and Firko.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Monmouth
County, Docket No. FD-13-0305-17.

Sean A. Smith argued the cause for appellant
(Brach Eichler, LLC, attorneys; Carl J.
Soranno, Sean A. Smith, and Mia V. Stollen,
of counsel and on the brief).

John Thaddeus Rihacek argued the cause for respondent (Pavliv & Rihacek, LLC, attorneys; John Thaddeus Rihacek, on the brief).

PER CURIAM

Plaintiff, R.R.[1], appeals from the December 2, 2016 Family Part orders entered after a plenary hearing, which dismissed her complaint seeking a genetic test to establish paternity. We affirm substantially for the reasons set forth in the comprehensive decision rendered by Judge Lisa P. Thornton.

I.

The chronology is critical to our reasoning in this matter. Plaintiff filed a non-dissolution application against defendant, J.M., her former paramour, seeking to compel him to submit to genetic testing in order to establish paternity of her son, J.R. At the time of the 2016 hearing, J.R. was fourteen years old. Plaintiff was married to defendant, B.R., when J.R. was born. J.R. is their second child together.

R.R. and B.R., were married on July 12, 1992, and divorced on July 6, 2005. They litigated the divorce matter through binding arbitration with a retired Superior Court Judge, who rendered a decision which ultimately was incorporated into the parties' Final

---

[1] Since this matter involves paternity of a minor child, initials are being used to protect the confidentiality of the parties. See R. 1:38-3(a)(14).

Judgment of Divorce ("FJOD"). B.R. was ordered to pay child support to R.R. for J.R., who was four years old at the time, and the parties' daughter, who is now emancipated.

Following the divorce, R.R. and B.R. were litigious. Sixty motions and applications were filed addressing post-judgment matters. Ten years after the divorce, R.R. raised the paternity issue for the first time in a post-judgment motion in the divorce case. On July 18, 2016, the trial court denied R.R.'s motion to compel B.R. to undergo genetic testing. A motion for leave to appeal that order was denied on March 15, 2016.

R.R. renewed her request for genetic testing in the non-dissolution complaint. R.R. asserted she had an extra-marital affair with her former employer, J.M., from 1999 until 2003. She claimed she had unprotected sexual intercourse with J.M. thirty days before and thirty days after J.R. was conceived.[2]

She informed J.M. that she was pregnant, but not that he was J.R.'s father. When J.R. was born, B.R. was named the father on the birth certificate and assumed the role of a "loving, caring,

_____

[2] Defendant B.R. filed a cross-motion seeking to have the dissolution matter (FM docket) consolidated with the non-dissolution matter (FD docket) and to have R.R.'s FD complaint dismissed on the grounds of judicial estoppel based upon R.R.'s concession as to B.R.'s paternity in the FM matter. Judge Thornton did not consolidate the FD and FM matters. B.R. did not participate in this appeal.

doting, adoring father," as found by Judge Thornton. B.R. testified that he "never missed a moment of parenting time" until R.R. uprooted J.R. and moved him to Morris County, where she currently resides with her boyfriend. Abuse allegations against B.R. arose thereafter. J.R. became estranged from B.R. and had not seen him in over two years as of the time of the trial court proceedings.[3]

R.R. now contends that it is "nearly impossible" that B.R. is J.R's biological father because their sexual encounters were "infrequent," due to B.R.'s "health issues." She testified that he was impotent. He denied that, and testified that their sexual encounters were "more than infrequent."

As to J.M., she testified that their sexual encounters were "weekly, sometimes bi-weekly." However, J.M. testified that he saw her only "[a] couple of times, three, four, times in a year."

R.R. provided inconsistent accounts about when she concluded that J.M. was J.R.'s father, and who she told what and when. R.R. set forth in one of her certifications submitted with her application that she suspected J.M. was J.R.'s biological father from the beginning: "In 2001 when I found out that I was pregnant . . . I told [J.M.] (as I suspected he was the father)." To the

---

[3] At the time of oral argument, counsel confirmed that J.R. still has not seen B.R.

contrary, J.M. testified that she told him that B.R. was the father. B.R. testified that he never doubted his paternity.

As the trial court noted, R.R. offered a different account in a second certification, "in stark contrast to her first certification." R.R. stated that she "did not come to truly believe that [J.M.] could be [J.R.'s] father until [J.R.] grew older and his appearance changed. I now believe that it is nearly impossible for [B.R.] to be [J.R.'s] father and it is important to determine whether or not my beliefs are accurate." She acknowledged that J.M. never admitted to paternity, never sent her cards or letters regarding the pregnancy, never offered to pay for an abortion, never visited J.R., and never provided financial support.

The trial court considered a photograph of J.R. R.R. testified that J.R.'s eyebrow, hair line, crooked front tooth, and broad chest resembled those of J.M. B.R. testified that he and J.R. had the same hair color and J.R. has a fair complexion. J.M. testified that he was of Italian descent and that he has an olive complexion.

At the hearing, R.R. denied filing the application in order to interfere with B.R.'s relationship with J.R. Notwithstanding that representation, she also testified that B.R. was abusive to J.R. and that she believed J.R. should know that B.R. is not his

A-1973-16T4

biological father, and that it would not have a negative impact on the child. Even if it did, it was a risk that she was "ready to take."

R.R. considered the possibility J.M. would not want a father-child relationship with J.R. if paternity were established. J.M. is married and has four sons, a daughter, and a granddaughter. He testified unequivocally that his family would not accept J.R. if his paternity was established, and that he was not looking to establish a relationship with him. R.R. attempted to rationalize, "I don't know that that would be the case. I'm not sure that [J.R.] would really do that . . . I think it's important to find out and establish paternity either way."

Judge Thornton denied R.R.'s request for genetic testing. As R.R. contends Judge Thornton applied the wrong legal standard, we will address the judge's conclusions of law in detail in the legal discussion. Suffice it to say here that the judge found B.R. and J.R. to be credible, and R.R. to be incredible. The judge noted R.R.'s inconsistent statements about who was J.R.'s father. She noted that R.R. testified in a prior proceeding that if B.R. was not J.R.'s father, then she did not know who was. The court found that R.R. was motivated by her enmity for B.R. R.R. wanted J.M to take a DNA test because, as R.R. admitted, "[B.R.] is crazy" and "keeps going for custody." The judge found that R.R. knew

that J.M. "had no desire to have a relationship with J.R. even if he was his son, but was willing to risk J.R.'s emotional health and expose him to further humiliation and rejection."

## II.

R.R. raises three points on appeal. She contends the court applied the wrong legal standard for assessing her claim. In particular, she contends the judge applied the Uniform Parentage Act, instead of the standard set forth in D.W. v. R.W., 212 N.J. 232 (2012). She also contends the trial court erred by not acknowledging that she met her burden to submit a sworn statement regarding paternity. Lastly, she contends the trial court failed to shift the burden to defendant to show why genetic testing should be denied.

In assessing R.R.'s arguments, we apply a limited scope of review. We owe substantial deference to the Family Part's findings of fact because of that court's special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Thus, "[a] reviewing court should uphold the factual findings undergirding the trial court's decision if they are supported by adequate, substantial and credible evidence on the record." MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (alteration in original) (quoting N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

While we owe no special deference to the judge's legal conclusions, Manalapan Realty, LP v. Township Committee of Mnalapan, 140 N.J. 366, 378 (1995), we will not disturb the judge's "'factual findings and legal conclusions . . . unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice' or when we determine the court has palpably abused its discretion." Parish v. Parish, 412 N.J. Super. 39, 47 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412). We will only reverse the judge's decision when it is necessary to "'ensure that there is not a denial of justice' because the family court's 'conclusions are [] clearly mistaken or wide of the mark.'" Id. at 48 (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

We consider first R.R's contention that the court applied the wrong legal standard.

A paternity test is not an automatic right of putative fathers or anyone else. It should only be ordered by a court after a careful balancing of all of the circumstances surrounding the alleged paternity. C.R. v. J.G., 306 N.J. Super. 214, 228 (Ch. Div. 1997) (citations omitted).

The New Jersey Parentage Act ("NJPA"), N.J.S.A. 9:17-38 to 9:17-59, and not the traditional best interest of the child standard, governs applications to either prove or disprove paternity. D.W., 212 N.J. at 236 (citation omitted). One of the primary goals of the NJPA is to "ensure that children receive the financial support from their parents to which they are entitled." Id. at 246.

As noted in D.W., the NJPA does not dictate how to determine if good cause exists to deny genetic testing. The Court devised eleven factors a trial court should consider in determining if good cause exists to undergo or forgo genetic testing:

> (1) the length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged father was placed on notice that he might not be the genetic father;
>
> (2) the length of time during which the presumed or acknowledged father has assumed the role of father of the child;
>
> (3) the facts surrounding the presumed or acknowledged father's discovery of his possible nonpaternity;
>
> (4) the nature of the relationship between the child and the presumed or acknowledged father;
>
> (5) the nature of the relationship between the child and any alleged father;
>
> (6) the age of the child;

(7) the degree of physical, mental, and emotional harm that may result to the child if presumed or acknowledged paternity is successfully disproved;

(8) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child;

(9) the extent, if any, to which uncertainty of parentage exists in the child's mind;

(10) the child's interest in knowing family and genetic background, including medical and emotional history; and

(11) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or acknowledged father or the chance of other harm to the child.

[Id. at 257.]

In considering the application, Judge Thornton appropriately applied this eleven factor test.

As the judge found, R.R. waited over fourteen years before filing an application to adjudicate parentage even though she had suspicions early on that J.M. was the father. B.R. is the only father J.R. knows and he provided financial support for him over the years. After personal observation, the judge did not see any resemblance between J.R. and J.M., further substantiating her conclusion that R.R. was disingenuous. Only after R.R. moved J.R. to Morris County did he rebel against his mother and express a

desire to live with B.R. The child's position dramatically changed after a trip to Florida with his mother and her new boyfriend. J.M. has no relationship with J.R. and does not want one. The judge found:

> While [R.R.] may be willing to take the risk that J.R. will be emotionally harmed if paternity is disproved, this court is not. For the majority of his life, J.R. has been embroiled in the middle of a never-ending custody dispute between the parties and has been exposed to the venom and discord that often accompanies high conflict custody disputes. There is no question that he has had emotional problems, and the parties' inability to parent has played a role in [J.R.'s] difficulties. This court will not expose him to the possibility that someone else is his father, and the rejection that could come if paternity was disproved.[4]

Judge Thornton weighed the eleven factors fairly, and emphasized the role B.R. had played in J.R.'s life until recent years; B.R.'s financial support of the child; the absence of any relationship between J.R. and J.M.; and his lack of interest in forming any relationship with the child.

Moreover, the record fully supports Judge Thornton's conclusion that R.R. is not seeking financial support from J.M., and that there is no credible evidence that he is J.R.'s father.

---

[4] At oral argument, counsel for R.R. advised that the underlying matter was transferred from Monmouth to Morris County and that J.R.'s guardian ad litem was discharged.

In light of the court's application of the <u>D.W.</u> factors, we reject R.R.'s contention that the court incorrectly applied the Uniform Parentage Act. The judge referenced the Uniform Parentage Act's ("UPA") principle of parentage by estoppel as espoused by the Supreme Court in <u>D.W.</u>, 212 N.J. at 255-56. Although the UPA was not adopted in this State, the judge came to the correct conclusion, and "it is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." <u>Do-Wop Corp. v. City of Rahway</u>, 168 N.J. 191, 199 (2001) (citing <u>Heffner v. Jackson</u>, 100 N.J. 550, 553 (1985)).

As to the second issue raised, R.R argues that the trial court misapplied the law governing motions to compel genetic testing because R.R. met her burden by virtue of her sworn statement alleging J.M.'s paternity. Applying our deferential standard of review, we reject this contention based upon the trial court's thoughtful opinion. Judge Thornton's finding that R.R. was not credible also finds strong support in the record. She found that R.R. made a "poor witness" and that there were inconsistencies in her two certifications which were not reconciled at the hearing. On the other hand, the judge found J.M. and B.R. to be "fair witnesses."

Paternity is presumed under the law where a man is married or was married to a child's biological mother, and the child was born during the marriage. N.J.S.A. 9:17-43(a)(1). The presumption of paternity may be rebutted by clear and convincing evidence in an appropriate proceeding. N.J.S.A. 9:17-43(b). The record supports the trial court's finding that R.R. failed to meet that burden.

J.R.'s paternity was adjudicated at the time the FJOD was entered and should not be disturbed at this juncture. The NJPA mandates that paternity actions be joined in an action for divorce. N.J.S.A. 9:17-46(a).[5]

Finally, R.R. argues that "the trial court erred by not shifting the burden to [B.R.] to demonstrate good cause for why genetic testing should not be ordered." We find no error here. There was ample evidence in the record to support the court's finding that there was good cause to deny genetic testing. As Judge Thornton declared, "[R.R.] filed this paternity claim after she was thwarted in her attempts to terminate [B.R.'s] custody rights." The judge further elaborated that "[R.R's] actions in filing the paternity action are not motivated by a desire for J.R.

---

[5] The NJPA provides that no action shall be brought pursuant to the act more than five years after the child attains the age of majority. N.J.S.A. 9:17-45(b). This creates a twenty-three year statute of limitations commencing with the child's date of birth.

to know his family or medical history." The circumstances presented and found by Judge Thornton reveal that "[t]he matter was not filed to ensure that J.R. was supported financially." The judge concluded that the paternity action was filed to "hurt defendant [B.R.]" and as a "desperate attempt to undercut this Court's rulings and validate the two-year separation between J.R. and his father." Therefore, R.R's argument fails as to shifting the burden of proof.

In sum, after reviewing the record, we conclude that Judge Thornton's factual findings are fully supported, and her legal conclusions are sound. We therefore affirm Judge Thornton's denial of genetic testing and dismissal of the complaint against J.M., and her denial of the application to consolidate the FD and FM matters.

Affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1973-16T4