**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3781-23

J.V.,[1]

    Plaintiff-Respondent,

v.

C.H.,

    Defendant-Appellant.

_____

Submitted January 13, 2026 – Decided June 18, 2026

Before Judges Rose and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-3243-24.

C.H., self-represented appellant.

J.V., self-represented respondent.

PER CURIAM

---

[1] We use the parties' initials and pseudonyms to protect the victim's privacy. See R. 1:38-3(a)(1).

Defendant C.H. (Carl) appeals from a June 25, 2024 final protective order (FPO) issued against him and in favor of plaintiff J.V. (Jane) pursuant to the Victim's Assistance and Survivor Protection Act (VASPA), N.J.S.A. 2C:14-13 to -21. We affirm.

I.

We summarize the pertinent facts and events from the trial record. Trial was held on two consecutive days in May 2024. Both parties were self-represented and testified on their own behalf. The court also considered YouTube video recordings[2] and emails admitted in evidence, but denied as irrelevant Carl's application to call a witness to testify "[Jane] was disgruntled that [Carl] was filing complaints against her before the trial [date]" in a related matter.[3]

The parties first encountered each other in February 2023, when Jane, an assistant prosecutor, was assigned to a criminal case charging F.E., Carl's former girlfriend, with third-degree burglary and third-degree theft charges allegedly

---

[2] The video recordings were not provided on appeal, but the portions played at trial were transcribed verbatim into the record.

[3] The court conducted direct examination of both parties and afforded them the opportunity to cross-examine each other. Neither party objected to that procedure. Carl cross-examined Jane; Jane did not cross-examine Carl.

committed against Carl. Shortly after F.E.'s arraignment, Carl telephoned Jane at her office and advised he had documents relevant to the prosecution. Jane testified their conversation was "friendly." Jane scheduled an in-person meeting with Carl to discuss the matter in April 2023 at her office.

Jane further testified, thereafter during plea negotiations, F.E.'s attorney provided reciprocal discovery and F.E. rejected the State's plea offer. After reviewing the proofs, the prosecution "downgraded" the charges against F.E. to disorderly persons offenses and, as such, the matter "was no longer jury trial eligible." Jane stated, around the same time, the related case, charging F.E. with violating a final restraining order (FRO), was assigned to another assistant prosecutor and dismissed by the prosecution for lack of proof.

Jane and her supervisors met with Carl to explain the dispositions. Jane thought the meeting "went pretty well," but "[w]ithin twenty-four hours," Carl contacted Jane and her supervisors "indicating he was highly offended by the meeting," "unhappy with how the meeting went," and dissatisfied with the manner in which the prosecution was handled.

Jane stated, by January 2024, but prior to the disorderly persons trial, "the real breakdown in communication" began. Jane explained Carl sent emails "multiple times a day" and their tone "became more angry and more accusatory

3

in nature." In particular, Jane testified she received "seventy-six emails in seventy-eight days, some of which were sent on multiple occasions on the same day." In his emails, Carl said "he had no faith in [Jane's] prosecution of the case," claimed she was lying to him, and stated, "you think you're getting over, but soon you will see," which Jane perceived as a threat against her. Carl also called "[t]wo to three times a day" and thrice appeared at her office without an appointment.

On March 19, 2024, Jane's supervisor advised Carl the office was "done speaking to [him]" and directed him to appear in court for F.E.'s trial the following day. Jane testified she represented the State on the first day, but the first assistant prosecutor removed her from the case before the April 1, 2024 second and final trial day because the office was concerned about "[Carl]'s communication and action towards [her]."[4]

Jane testified, on March 26, 2024, she received emails from F.E.'s attorney alerting her to a video posted on Carl's YouTube channel, "Rescuing Our Communities"; two additional videos were brought to Jane's attention by someone in her office. Jane played excerpts of the three lengthy videos during

_____

[4] We glean from the record, the judge who presided over F.E.'s trial reserved decision following the close of all evidence and, on May 6, 2024, issued a judgment of acquittal.

her testimony in the present matter. Jane testified, in the videos, Carl stated his full name and acknowledged they were made by him.

The content of the videos is known to the parties, transcribed in the trial transcripts, summarized in the court's decision, and need not be extensively detailed here. In essence, in the videos, Carl made general claims of racism against "these prosecutorial and law enforcement systems" and specific disparaging remarks against Jane. For example, in the first video, Carl referred to Jane as a "fat racist prosecutor chick rival to [him] for over a year"; "dumb-ass chick" who was "fucking pathetic"; and "the worst excuse for a prosecutor I'm going after (inaudible)."

Carl further stated:

> Do this to an innocent man (inaudible) and any group of people that would help him, you don't deserve any type of political position. You should pray that I don't get to check on you because anybody who was involved in this, you have made an enemy out of me. You should have left me alone. You should not have violated my rights. You should not have gone after my daughter. If you are involved in this, you can look in my eyes and you will know what I am saying to be true. You and I will have a day.

Jane testified, after viewing the first video, she felt "[s]cared, upset, annoyed, harassed, exhausted," and "immediately went to [her] chain of

5

command" in view of her "safety concerns." Jane also notified her family members.

The second video continued in a similar vein. Carl asserted, in pertinent part:

> This prosecutor lied. This by definition is prosecutorial misconduct. If I can prove that I sent her these text messages that a defense attorney cross-examined me to incompleteness and she purposely withheld them, she has a problem. They're mad at me. I don't give a fuck, people. I'm going to get this lady's job. She should not have done this.

In the third video, Carl persisted, stating in relevant part:

> So, . . . over the last couple of days I have cited misconduct by the prosecutor who is allegedly charging [F.E.] in the events that she committed against me. For anyone who has watched that video and watched the evidence I put up, you see definitively that that prosecutor lied.
>
> I have audio of her admitting to it. I have emails. People this lady is done.
>
> . . . .
>
> This woman has lied through her teeth and now she's afraid because I have proof that could cost her her job. But people I'm not going to stop. I'm going to file more litigation. I'm going to file the grievances.

During his testimony, Carl confirmed, after Jane's office stopped responding to him, he filed grievances with state and federal authorities. He

6

also testified, before Jane was removed from the case, he asked her office to replace her with another prosecutor "fourteen times and [he] was denied fourteen times."

Carl testified, "[He] had no intent to harass [Jane]." Walking back his coarse language in court, Carl nonetheless acknowledged his profanity-laced remarks in the videos, but claimed they were "[his] honest opinion under [his] First Amendment right to freedom of speech."

Carl acknowledged the videos played during trial were from his YouTube channel. Carl apologized for his "nasty" comments, asserting they were made "because [he] was angry" and "horribly hurt" by Jane's actions. Carl stated the videos were: "not intentionally directed to harm [Jane]"; "[he] would have never directed them toward her"; "[the parties] ha[d] no social circle in common"; "[n]o one in the prosecutor's office follow[ed his channel]"; and "[he] had no way of knowing that she would see any of that content." But Carl acknowledged his YouTube channel was public, and F.E. and her attorney subscribed to his channel.

Following summations, the court requested briefs from the parties addressing our decision in S.B.B. v. L.B.B., 476 N.J. Super. 575 (App. Div. 2023). On June 25, 2024, the court issued the FPO accompanied by a cogent

written statement of reasons, noting neither party analogized the facts of the present matter to the circumstances in S.B.B.

In its decision, the court set forth its factual and credibility findings and addressed Jane's application for an FPO in view of the governing legal principles. The court found Jane credible, noting she was prepared, "gave prompt and responsive answers to all" questions posed, and "conveyed a sense of anxiety and exasperation at [Carl]'s conduct, but . . . was measured in her tone and presentation."

Conversely, the court described Carl as "agitated and, at times, angry during his testimony." The court noted Carl "freely admitted his conduct and his motivation" and neither denied he created the videos nor intended to use them to harm Jane professionally. The court further found Carl was "accusatory and paranoid." But the court deemed Carl credible because, "disregarding any suggestion in his testimony that his conduct was in any way justifiable," he "candidly admit[ted] what he did and why he did it."

Turning to its legal analysis, the court first addressed Carl's claim that his statements in the YouTube videos were protected speech under the First Amendment. The court extensively analyzed and distinguished the circumstances surrounding the video recording created and disseminated by the

8

defendant in S.B.B., from the circumstances in the present matter. As the court

appreciated, in S.B.B., we noted the defendant

> appeal[ed] from the entry of a[n FRO] entered against her in favor of her estranged husband, plaintiff S.B.B., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The FRO was based on the predicate act of harassment. The communication underlying the trial judge's finding of harassment was [the] defendant's creation and dissemination of a video accusing her estranged husband of improperly withholding a get, a Jewish bill of divorce, and asking community members to "press" her husband to deliver the get. Because defendant's communication constituted constitutionally protected free speech, we reverse[d].
>
> [476 N.J. Super. at 584.]

Here, the court found, unlike the harassment charge at issue in S.B.B., the

cyber-harassment charge in the present matter has "different statutory

elements." The court further found, unlike the defendant in S.B.B., Carl did not

"disclaim[] any knowledge of or participation in the dissemination of the

video[s]." Indeed, the court recognized, "[Carl] ma[de] a myriad of admissions

in the videos themselves and corroborate[d] the intentions and purpose of the

videos in his trial testimony."

Notably, the court also found "[Carl]'s videos [we]re designed to attack

[Jane's] property right . . . her job." The court thus found, unlike the defendant's

9

video in S.B.B., Carl's videos "serve[d] no legitimate purpose," but rather "sought to impugn [Jane]'s character, integrity[,] and professionalism not simply out of spite, but specifically to bring about the end of her employment." The court thus concluded, "Because [Carl]'s videotapes regarding [Jane] served no legitimate purpose, were made and disseminated with the purpose to harass [Jane] and designed to threaten her job, [Carl could] not avail himself of the cloak that is First Amendment protection."

The court therefore addressed whether Jane satisfied her burden of proving the predicate act of cyber-harassment alleged in her VASPA complaint. Summarizing the elements of the statute, N.J.S.A. 2C:33-4.1, which track the definition set forth in N.J.S.A. 2C:14-14(a)(1), the court found Carl did not dispute he made "communications via videos live-streamed and then posted [them] to his YouTube page," satisfying the "online" communications element; and acted with the intention of "secur[ing] the termination of [Jane]'s employment," evidenced, for example, by his statement, "he was 'going after her job,'" fulfilling the intent and threat against a person's property elements. The court cited case law to support its findings.

Repeatedly citing the record, the court found Carl's intent was clear:

> A review of the record at trial indicates [a] substantial evidentiary basis to support a finding that it

10

was [Carl]'s purpose to harass [Jane]. He admitted creating the videos, he live-streamed them and kept them posted on his YouTube page. He identified by name [Jane] in the videos (and [F.E.,] too), so there could be no doubt who this was all about. . . . He advised all who listened or watched his videos, that he was "coming for [Jane's] job" and claimed to have "proof" that would result in [Jane] getting fired. . . . Moreover, [Carl]'s trial testimony was unequivocal that [Jane]'s termination was his ultimate objective. The [c]ourt here need not draw inferences, whereas here, the many proofs of [Carl]'s purpose were overtly stated and explicit. Common sense and experience inform this [c]ourt that [Carl]'s public campaign to secure the end of [Jane]'s employment was designed to harass [Jane].

Referencing well-established case law, the court noted for more than one hundred years, our courts have repeatedly recognized "a calling, business or profession chosen and followed[,] is property." Cooper Med. Ctr. v. City of Camden, 214 N.J. Super. 493, 496 (App. Div. 1987) (quoting State v. Chapman, 69 N.J.L. 464, 466 (Sup. Ct. 1903), aff'd 70 N.J.L. 339 (E. & A. 1903)).

Pursuant to its detailed analysis, the court therefore concluded Jane proved the predicate act of cyber-harassment under VASPA. However, the court did not expressly state Jane established an FPO was necessary to protect Jane from the possibility of future risk to her safety or well-being.

11

On appeal, Carl raises the following points for our consideration[5]:

> A. THE TRIAL COURT ERRED IN FINDING CYBER[-]HARASSMENT WHERE NO DIRECT DISTRIBUTION OF CONTENT TO RESPONDENT OCCURRED.
>
> B. THE TRIAL COURT'S DECISION VIOLATES [CARL]'S FIRST AMENDMENT RIGHTS BY RESTRICTING LAWFUL SPEECH ON A MATTER OF PUBLIC CONCERN.
>
> C. THE TRIAL COURT ERRED IN IT'S ASSESSMENT [JANE] HAD A "PROPERTY RIGHT" REGARDING EMPLOYMENT AS A STATE PROSECUTOR.
>
> D. THE TRIAL COURT VIOLATED [CARL]'S DUE PROCESS RIGHTS BY EXCLUDING A MATERIAL WITNESS WHO WOULD HAVE IMPEACHED [JANE]'S TESTIMONY.
>
> E. THE TRIAL COURT ERRED [I]N ITS "REVENGE" MOTIVE OF [CARL] AS THE CAUSE OF THE CREATION OF VIDEOS IN RETALIATION TO THE LOSS OF THE TRIAL OF HIS OFFENDER.

---

[5] For the first time on reply, Carl argues none of the YouTube videos contained lewd or obscene content. "Raising an issue for the first time in a reply brief is improper" because the trial judge has not considered it and the parties have not "properly addressed" it. Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001). We note only Jane did not allege the videos contained lewd or obscene content under VASPA.

In VASPA matters, "[w]e defer to a trial court's factual findings 'when supported by adequate, substantial, credible evidence.'" C.R. v. M.T., 257 N.J. 126, 139 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). Our "deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007)). We therefore will not disturb the court's factual findings "unless they 'went so wide of the mark that a mistake must have been made.'" Ibid. (quoting MacKinnon, 191 N.J. at 254). However, we review de novo questions of statutory interpretation. Ibid.

Relevant here, VASPA[6] permits

> [a]ny person alleging to be a victim of . . . cyber-harassment, and who is not eligible for a restraining order as a "victim of domestic violence" as defined by [the PDVA], . . . except [under circumstances not relevant here, to] file an application with the Superior Court pursuant to the Rules of Court alleging the commission of such conduct . . . and seeking a temporary protective order.

---

[6] On January 1, 2024, VASPA replaced and expanded the scope of protections afforded under the Sexual Assault Survivor Protection Act, N.J.S.A. 2C:14-13 to -21, which protected individuals who were not eligible under the PDVA, but was limited to "acts of nonconsensual sexual contact, sexual penetration, or lewdness, or attempts thereof, committed against" a victim. Assemb. Health Comm. Statement to S. 1517, at 1 (Mar. 20, 2023) (L. 2023, c. 127).

[N.J.S.A. 2C:14-14(a)(1).]

The statute defines "cyber-harassment" as

> conduct that occurs, while making one or more communications in an online capacity via any electronic device or through a social networking site and with the purpose to harass another, that involves: threatening to inflict injury or physical harm to any person or the property of any person; knowingly sending, posting, commenting, requesting, suggesting, or proposing any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to the reasonable person; or threatening to commit any crime against a person or the person's property.
>
> [Ibid.]

See also, N.J.S.A. 2C:33-4.1(a).

During the FPO hearing, the alleged victim must prove "the allegations made in the application for a protective order" by "a preponderance of the evidence." N.J.S.A. 2C:14-16(a). In its determination:

> The court shall consider but not be limited to the following factors:
>
> (1) the occurrence of one or more acts of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, or acts of stalking or cyber-harassment against the alleged victim; and

14

> (2) the possibility of future risk to the safety or well-being of the alleged victim.
>
> [Ibid.]

As a threshold matter, we recognize in its statement of reasons the court did not expressly state Jane satisfied the second factor, N.J.S.A. 2C:14-16(a)(2). Before us, however, Carl does not raise the issue. "An issue not briefed is deemed waived." W.H. Indus., Inc. v. Fundicao Balancins, Ltda, 397 N.J. Super. 455, 459 (App. Div. 2008); see also Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026). We nonetheless recognize, in its factual findings, the court cited Jane's testimony and found, after viewing the first video, "[Jane] felt harassed and had safety concerns." Further, in its credibility findings, the court noted "[Jane] conveyed a sense of anxiety." The record supports Jane's ongoing fear of Carl at the time of her testimony.

We have considered Carl's reprised arguments in view of the applicable law, the court's decision, and the trial record, and conclude the contentions raised in points A, B, D, and E lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons expressed by the trial court in its well-reasoned decision.

15

The crux of Carl's argument, raised in point C, is the court erroneously determined Jane possessed a property right in her employment because she was a public "at-will" employee. To support his argument, Carl miscites and misconstrues case law. For example, in his merits brief Carl cites "In re Att'y Gen.'s 'Directive on Exit Packages', 200 N.J. 283 (2009)," claiming our Supreme Court held "county prosecutors and their assistants serve at the pleasure of the Governor and do not have property rights in their employment." However, the correct title of the case is, "In re Attorney General's 'Directive on Exit Polling: Media & Non-Partisan Public Interest Groups'" – and the Court did not so hold.

Instead, we have recently reiterated the principal espoused in Chapman, 69 N.J.L. at 466, recognized by the trial court here, "[a] calling, business or profession, chosen and followed, is property." A.C. v. R.S., 483 N.J. Super. 47, 57 (App. Div. 2025). Although we were ultimately unconvinced the plaintiff in A.C. demonstrated the defendant's text messages "threaten[ed] to inflict any injury or harm, let alone threaten[ed] to commit a crime, affecting [the] plaintiff's job," we recognized the "defendant's statement, she would go to the [plaintiff's former public employer, the Essex County Department of Corrections] and [the] plaintiff's new employer, targeted [the] plaintiff's

property." Ibid. Similarly, we discern no error in the court's finding Jane held

a property right in her employment.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division