# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3638-21

H.G.,[1]

    Plaintiff-Appellant,

v.

D.G.,

    Defendant-Respondent.

_____

Argued January 31, 2024 – Decided March 6, 2024

Before Judges Firko and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-0211-22.

Bonnie C. Frost argued the cause on behalf of appellant (Einhorn Barbarito Frost & Botwinick, PC, attorneys; Bonnie C. Frost, Matheu D. Nunn, and Jessie M. Mills, on the briefs).

Hanan M. Isaacs argued the cause on behalf of respondent (Kingston Law Group, attorneys; Hanan M. Isaacs, on the brief).

---

[1] We use initials to protect the confidentiality of the parties. R. 1:38-3(c)(12).

PER CURIAM

Plaintiff H.G. appeals from a June 23, 2022 order dismissing her temporary restraining order (TRO) and denying her application for a final restraining order (FRO) pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The judge also dismissed defendant D.G.'s cross-TRO following a lengthy trial. We affirm.

I.

The facts were established at the eight-day trial conducted on non-consecutive days between March 8 and June 16, 2022. The parties were married in 2003. In 2015, when the parties were in their fifties, they had a daughter, L.G., by donor and a surrogate. Both parties are highly educated and employed at an insurance company as vice presidents and actuaries. By 2021, the parties' relationship became strained.

On August 9, 2021, plaintiff filed a complaint against defendant alleging that he had committed acts of domestic violence against her, specifically assault and harassment, and seeking injunctive relief under the PDVA. In her complaint, plaintiff asserted that on the morning of July 27, 2021, the parties and L.G. were eating breakfast in the kitchen in their home. Plaintiff prepared "a special treat" along with other breakfast items for the family. L.G. had

misbehaved the night before and plaintiff removed the treat from her.  Plaintiff alleged she went upstairs to her bedroom with her breakfast and special treat.  Plaintiff averred defendant chased her into her bedroom.  Plaintiff alleged she told him to leave her alone and proceeded to shut the door, but defendant pushed his way in.

According to plaintiff's complaint, defendant "aggressively and forcibly" tried to remove the special treat from her and engaged in an "altercation" with her, which caused defendant to "slip" and plaintiff to be "pulled over."  The parties continued to quarrel.  Plaintiff alleged defendant "forcefully and without warning" shoved her, which "caused her to strike the right side of her forehead near the temple against the corner of the bedroom dresser."  Plaintiff alleged she sustained a "deep laceration" to her forehead, which caused "profuse bleeding," dizziness, a headache, extreme emotional distress, and that she feared for her safety.

Plaintiff also alleged that when she called 9-1-1, defendant took the phone from her and "misrepresented the circumstances of the assault to the dispatcher."  Plaintiff stated she was brought to the hospital, received stitches to close her wound, and underwent a CT scan.  While plaintiff was being transported to the

3

hospital by paramedics, she claimed she overheard defendant make "false representations to the police concerning" her and the incident.

In terms of prior domestic violence history, plaintiff alleged in her complaint that in 2017, defendant "physically attacked" her by grabbing her hair. Plaintiff alleged defendant "has cornered" her against the wall and grabbed her on several past occasions, resulting in bruises to her hands, arms, and eye.

In her amended TRO complaint, plaintiff alleged that defendant would "control" her attendance at social functions, she would "remove herself from arguments," and defendant would "berate, belittle, and argue" with her, while he cornered her in "various rooms," until she agreed with him. Plaintiff alleged she would attempt to take the car and leave the marital residence, but defendant would "forcibly keep the car keys" so she could not leave. Before their daughter was born, plaintiff alleged she tried to leave the house in the midst of an argument and defendant "grabbed her, pinned her down on the floor . . . with her face down . . . and put his knee on her back." Plaintiff also alleged defendant forced her to put her arms "behind her back," which caused her to "suffer pain."

On August 13, 2021, defendant[2] filed a cross-complaint against plaintiff alleging that she had committed acts of domestic violence against him, specifically assault, criminal restraint, false imprisonment, and harassment, and seeking injunctive relief under the PDVA. In his cross-complaint, defendant asserted that on July 27, 2021, L.G. was showing him affection by rubbing his arm, which caused plaintiff to become very angry. He alleged plaintiff removed "bread"[3] from the table and said, "that's no way to treat me," and took the bread upstairs.

Defendant alleged he attempted to de-escalate the situation. As he tried to take the bread, he claimed plaintiff "attacked" him, "scratched his hand, knocked him down and got on top of" him, on the landing at the top of the stairs. Defendant went back to the bedroom to get the bread back and plaintiff blocked him from leaving the room.

Defendant alleged he tried to "slip past" plaintiff with his "arms raised," and she tried to grab the bread from him. As a result, defendant alleged plaintiff

---

[2] For purposes of consistency and clarity, we refer to defendant here and throughout the opinion as defendant even though he is named as plaintiff in the cross-complaint and plaintiff is named as defendant.

[3] "Bread," "special treat," and "cheese balls" are used interchangeably in the record.

A-3638-21

"was knocked into [the] dresser" causing her to hit her head on the dresser. Defendant took the bread downstairs to L.G. and went back upstairs while plaintiff called 9-1-1. When plaintiff spoke to the 9-1-1 operator, defendant overhead her say that she "didn't think [defendant] knocked her into [the] dresser on purpose."

In terms of prior domestic violence history, defendant alleged over the last five years, plaintiff has "hit" him, threatened to jump out of moving cars, and "hit her head against walls." Defendant also alleged plaintiff has taken items out of the bathroom and "thrown them" at him, damaging furniture, and that she "threw a TV remote at the TV." On May 9, 2021, defendant alleged the parties were driving to the park with L.G. and a song came on that plaintiff disliked. She "demanded" defendant turn it off, but he hesitated to do so because L.G. "liked the song." According to defendant, plaintiff "began shouting" and "tried to get out of [the] moving car."

On May 4, 2021, defendant alleged the parties had a "verbal altercation over work" and plaintiff became angry in front of L.G. On July 20, 2020, defendant alleged the parties went to Toronto for work and his parents watched L.G. Defendant claims plaintiff "was verbally abusive multiple times," and his parents asked them to leave. On January 6, 2020, defendant alleged L.G. wanted

plaintiff to read her a bedtime story and plaintiff "became angry" with him, "smacked" L.G. "on her bottom," and told her to get out of the house. In July 2019, defendant alleged the parties tried to get L.G. sleepy by taking her for a drive when plaintiff became angry and "jumped out of the car about [two] miles from home." In November 2017, defendant alleged plaintiff became angry when he asked her to cut up L.G.'s food and "screamed and yelled" at him in front of the child.

Both parties, each represented by counsel, testified at the hearing about the allegations in their complaints, and the judge heard testimony from police officers, considered thirty-five exhibits, and reviewed eight videos of police bodycam footage along with voluminous bodycam transcripts. Plaintiff waived the use of a Mandarin interpreter at trial.

Plaintiff testified regarding the allegations in her amended complaint and the injuries she sustained. Plaintiff testified she did not want to reinforce L.G.'s inappropriate behavior on the day of the subject incident and only removed the treat from her breakfast plate, leaving her a full meal. To avoid a confrontation, plaintiff testified she retreated to her bedroom with the treat and defendant chased her upstairs, would not leave her alone, forced his way into her room by

sticking his hand in the doorway to stop the door from being shut, and grabbed the treat from the plate on her bed.

As defendant exited her room, plaintiff testified she tried to scoop the treat from his right hand while standing behind him, and he swung around from his right side and attempted to remove he right hand with his left hand, causing him to fall backwards into the doorway. While he fell, plaintiff testified defendant grabbed her and she fell forward, took the crushed bread from his hand, tossed it into the hallway, and returned to her room to the foot of the bed. Plaintiff claimed defendant entered her room to get more bread and she tried to cover the plate with her arms, he took one or two cheese balls, and they both reached the doorway. According to plaintiff's version of events, defendant pushed her without warning, causing her to fall backwards, strike the right side of her forehead on the corner of her dresser, and "bleed profusely."

Plaintiff testified she said to defendant, "look at what you did to me," and he started to come towards her. In response, she called 9-1-1. Plaintiff testified defendant took the phone away from her and told the dispatcher, "[t]here's blood everywhere," plaintiff "bumped her head on the counter," and "he was trying to feed the child," but plaintiff physically blocked him from the door. Plaintiff testified she was in the background during the 9-1-1 call saying defendant

8

"pushed" her. Plaintiff testified she told investigating Officer Melissa Nagy, a domestic violence specialist, defendant "didn't care about her," and "he throwed me." Plaintiff claimed she requested an immediate TRO, but Officer Nagy told her to go to the hospital, file the TRO later, and had plaintiff sign the victim notification form refusing a TRO. Plaintiff told Officer Nagy that, after both parties re-entered the bedroom and defendant took three more cheese balls for L.G., plaintiff escalated physically: "I tried to grab his hand with the food" and would not let him leave.

At trial, plaintiff testified she was traumatized and did not realize what she had signed. In terms of prior domestic violence history, plaintiff testified whenever she tried to avoid a confrontation, defendant cornered her and argued with her until she agreed with him. Plaintiff explained that if she locked herself in a room, defendant would pop the lock open with a door lock pin and gain access. After L.G. was born, plaintiff testified that defendant told her she was an inferior parent because they used a donor and a surrogate, and L.G. is his child so he makes the decisions.

Plaintiff testified about a prior incident, which occurred on November 11, 2017, when the parties argued over the size she was cutting L.G.'s berries. Plaintiff testified defendant raised his voice and would not leave her alone.

When she wanted to go for a drive to get away from him, plaintiff testified defendant "pinned" her down on the floor and "put his knee on" her. Plaintiff also testified defendant has "grabbed her hair and covered her mouth." She called 9-1-1 but testified defendant "begged her" not to file a complaint, and when the police arrived, she declined to do so. Plaintiff also testified that defendant has called her a "useless, crazy woman" and "H cube"—"helpless hopeless [H.G.],"—as well as "bitch" and "cunt" in front of L.G. Plaintiff claimed she feared defendant because he is a weightlifter, has a martial arts background, and weighs fifty pounds more than she does.

Defendant testified that the November 11, 2017 incident served as a "blueprint" for him as to future interactions with plaintiff. In 2017, the police responded to plaintiff's 9-1-1 call. Defendant made a "pledge" on the officers' bodycam that he would never offensively touch H.G. To stop her screaming during that prior incident, defendant stated he put his hand on plaintiff's mouth, and she tried to bite him. Defendant testified he never picked a lock but "popped a simple bathroom lock with a small wire that was above the door" because plaintiff indicated to him on "multiple occasions [her] self[-]harm tendencies, and she had actually carried through with this in trying to jump out of cars . . . and slamming her head on the wall."

Regarding the July 27 incident, defendant testified L.G. said to him, "[D]addy, I want you to sit beside me," and in plaintiff's presence gave a cheese ball to him stating, "[O]ne for you daddy." According to defendant, L.G. gave him a second cheese ball and said, "Nothing for mommy." Defendant testified plaintiff exploded emotionally, left the kitchen, and L.G. began crying. Defendant testified he asked plaintiff to de-escalate but she refused, collected all the cheese balls, including L.G.'s, and headed to the second-floor stairway, balancing plates of cheese balls and corn. Defendant testified he tried to calm L.G. down, have her eat her breakfast, get ready for school, and wanted to drop her off at school before his morning business meeting. Defendant testified plaintiff was wearing flip flops and he was wearing socks, and therefore, walked slowly behind her as she went up the stairs.

Defendant testified he was not angry with plaintiff, but felt sorry for her, and did not want L.G. punished. He testified that he used his hand to stop the door from closing and walked into plaintiff's bedroom. Defendant testified plaintiff would not let him pass to get three cheese balls from the plate on the bed and "[s]he was hitting me with open hands on my hands and forearms." As defendant descended the first stair, he testified plaintiff grabbed him around his

A-3638-21

waist with two arms, pulled him up from the stairway, and then pulled him down to the ground. He told her, "You are assaulting me."

While defendant was on his back, he stated plaintiff got on top of him and sat on his right shoulder and biceps with her "derriere" in his face, causing him pain. Defendant testified plaintiff "was scratching my hand, grabbed my hand with two of hers, and squished the cheese balls." As a consequence, defendant stated he dropped the bread crumbs in the hallway. Defendant provided this version of events to Officer Nagy.

Sergeant Anthony Magistro testified that he was disturbed about plaintiff's manipulative behavior and profound story change, in which she denied being the aggressor and instead claimed to be the victim. Sergeant Magistro investigated the facts surrounding the July 27 incident, interacted with Officer Nagy and Officer William Knox, and conducted a detailed interview of defendant.

According to Sergeant Magistro, he learned that plaintiff assaulted defendant twice that day and injured her head while engaging in continued assaultive conduct. Sergeant Magistro testified he was upset and disheartened that, for the first time in his twenty-three years' experience on the police force,

A-3638-21

he had been directed to take a victim (defendant) out of the household and leave the aggressor (plaintiff) in the home.

After trial, the judge made findings and issued an eighty-page oral opinion. The judge found plaintiff was determined to punish L.G. for her bad behavior. The judge determined that plaintiff went from the kitchen to the dining room and headed up to the second-floor stairway, balancing plates of cheese balls and corn on her way up the stairs. The judge went on to state that defendant chose to "reason" with plaintiff rather than punish L.G. and followed plaintiff upstairs to her bedroom with the intent to get the cheese balls and resolve the situation without violence.

The judge noted that plaintiff ascended the stairs slowly and balanced plates of food while wearing flip flops. Defendant walked slowly behind her, in a careful fashion because he was wearing socks. The judge found defendant was not angry with plaintiff, but credited defendant's testimony that he felt sorry for her and did not want to see L.G. get punished. The judge carefully considered the events and found plaintiff put the plate of cheese balls on her bed and turned to close the door. The judge credited defendant's testimony that he said to plaintiff from the upstairs landing, "Let's not make a big deal about this," and

A-3638-21

used his hand to stop the door from closing and walked in. The judge determined there was no struggle regarding the door.

The judge also found when it became clear that plaintiff would not release L.G.'s food, defendant took three cheese balls from the plate on the bed and turned to leave and asked plaintiff to let him pass but she stated, "I forbid it." The judge found plaintiff shoved defendant and slapped his hands while he tried to deflect her blows. The judge did not find the allegations in plaintiff's amended complaint describing a continuous physical struggle inside her bedroom to be an accurate portrayal of the July 27 incident, and concluded defendant's version of plaintiff's first attack was "more likely than not" what occurred and rejected plaintiff's account as less credible.

The judge noted "[defendant's] initial accounting was spontaneous and demonstrative to Officer Nagy . . . his version is more likely than not what had occurred based on the facts presented . . . defendant is substantially consistent in recounting these allegations twice to Officer Nagy, to the [h]earing [o]fficer, and at trial."

The judge stated: "[Plaintiff] conveniently left [her first attack on defendant] out of what happened. She . . . left this part . . . out of her detailed statement to Officer Nagy in the afternoon. She did not tell the [h]earing

14

[o]fficer.  [It] [w]as not included in the TRO."  The judge observed plaintiff's explanation for willfully excluding this major episode, in which she was the aggressor, "loses credibility."

The judge found that defendant had learned an important lesson about "no touch" from the episode of November 11, 2017. Specifically, the judge noted that defendant tried to avoid conflict and physical violence on July 27, whereas plaintiff invited it by her conduct and then engaged in it.

The judge explained:

> Does [plaintiff's] swatting, flailing at defendant's arms, hands while he enters the room for a second time to [get] the cheese balls as he tries to grab from the bed and as he tries to [move] past her . . . to exit the room that she is blocking constitute assault? Yes. Clearly, there was an attempt to strike him, strik[e] at him, his arms and his hand with the cheese ball[s] was intentional and . . . assaultive.

According to the judge's findings, plaintiff gave three versions of how her head injury occurred: "[plaintiff's] closest most proximate statement was that she was pushed, gesturing with a backhand movement. She demonstrated to the [c]ourt a two-hand open movement, frontal push. Her afternoon interview with Officer Nagy was a two-arm throw and her testimony to the [h]earing [o]fficer was a one-arm throw."  The judge determined plaintiff "prevented [defendant]

from exiting the room with the cheese balls . . . . She was not going to allow him to give them to [LG]."

The judge found by a preponderance of the credible evidence that defendant, exiting the doorway, while plaintiff tried to dislodge cheese balls from his hand, "pushed her with the back of his hand," which caused her to strike the dresser. The judge noted, "[i]ncredulously, [plaintiff] maintains she never touched [defendant] . . . . Her actions in causing defendant to fall to the ground and then pinning him constitutes assault and reckless conduct."

The judge determined that defendant did not commit an act of domestic violence, and he did not have a sole purpose to harass plaintiff, but rather

> to get out of the room [while] plaintiff [was] preventing him from taking the cheese balls to [L.G. just] as she did in the first altercation. . . . It was [defendant's] reaction to the situational physicality initiated in the first altercation by [plaintiff] when she sought to grab the cheese balls the first time around and prevented him from going down the stairs with the cheese balls. . . . This event was unexpected[, u]nplanned and reactionary to a situation effectively created by [plaintiff] choosing to deal with a parenting decision this way and exacerbating the situation with her aggressive response to [defendant who tried] to resolve the situation reasonably for [L.G.] and [plaintiff] without violence.

The judge continued:

A-3638-21

> But for her aggressive action against him…, [his] reckless response would not have followed. His actions were not to abuse or control [plaintiff] but to quell a situation involving a crying child, school, and work time constraints and commitments and [plaintiff] who removed herself from a situation she created and could have best ameliorate[d] having used better judgment that morning.

The judge determined "[defendant's] initial accounting was spontaneous and demonstrative to Officer Nagy."

The judge highlighted that there were no reported acts of domestic violence between July 27 and August 9, the date of plaintiff's TRO filing. The judge observed the parties lived together in the same house without restraints for thirteen days following plaintiff's head injury and did the following activities together: drove L.G. to school; ate meals; took L.G. to her swimming and skating lessons; and enjoyed family outings at Six Flags in Jackson.

The judge noted the parties lived "amicably during that period without incident" and that plaintiff testified her participation in these post-injury activities was completely voluntary. The judge emphasized the parties have filed for divorce and have lived separately for the past ten months with no reported domestic violence concerns. Both parties' requests for a FRO were denied, and both TROs were dismissed following trial.

17

Plaintiff appeals, contending she established both the predicate acts of assault and harassment and the need for an FRO to protect her from immediate danger of harm and to prevent further abuse. We disagree.

II.

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal

18

conclusions and will review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes," Cesare, 154 N.J. at 400.

When determining whether to grant an FRO pursuant to the PDVA, the judge must make two determinations. See Silver, 387 N.J. Super. at 125-27. Under the first Silver prong, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)).

If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. While the second

19

prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25–29[(a)](1) to –29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

"[T]he Legislature did not intend that the commission of one of the enumerated predicate acts of domestic violence automatically mandates the entry of a domestic violence restraining order." Silver, 387 N.J. Super at 127. The factors which the court should consider include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) the existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a).]

A-3638-21

Although the court is not required to incorporate all of these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Cesare, 154 N.J. at 401-02 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment, and physical abuse," and on "whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248-49 (App. Div. 1995).

The court must also exercise care to "distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div. 2017). The PDVA is not intended to encompass "ordinary domestic contretemps." Corrente, 281 N.J. Super. at 250 (emphasis added). Rather, "the [PDVA] is intended to assist those who are truly the victims of domestic violence." Silver, 387 N.J. Super. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)). The second prong under Silver "requires the

conduct must be imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (quoting Silver, 387 N.J. Super. at 126-27).

A person is guilty of simple assault if he or she "[a]ttempts to cause . . . bodily injury to another" or "[a]ttempts by physical menace to put another in fear of imminent serious bodily injury." N.J.S.A. 2C:12-1(a)(1) and (3).

A person commits the predicate act of harassment if, with purpose to harass another, he or she:

> a.   Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b.   Subject another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c.   Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a) to (c).]

Here, the judge correctly determined that (1) plaintiff committed two physical assaults on defendant on July 27; (2) plaintiff withheld crucial information from the police officers and the court when she failed to confess the location and extent of her first attack; (3) defendant's version of the July 27

events was the more credible one; (4) an FRO was the wrong remedy for this family; and (5) family therapy was needed instead for the parties and L.G.

The judge found plaintiff and defendant each committed the predicate act of assault because: (1) plaintiff grabbed defendant and pulled him down, pinned him, sat on him, and clawed for the cheese balls in his outstretched hand; and (2) defendant backhandedly pushed plaintiff as he sought to flee from her bedroom after plaintiff's second attack upon him.  See N.J.S.A. 2C:12-1(a).

The judge focused on the parties' conduct and found neither party intended to abuse the other, and defendant's actions "were not to abuse or control [plaintiff] but to quell a situation involving a crying child, school, or work time constraints and commitments."  Compare with R.G., 449 N.J. Super. at 230 (denying an FRO because there was an insufficient nexus between the predicate conduct of simple assault and the parties' domestic relationship where plaintiff failed to show a "pattern of abusive and controlling behavior.").

We conclude there is no basis to disturb the judge's factual findings or legal conclusions.  The judge heard extensive testimony from the parties and witnesses and had ample opportunity to assess credibility.  We discern no evidentiary errors, oversight, or abuse of discretion.

In the matter under review, the judge did not minimize one of the goals of Silver—whether the predicate act involved a violent act. See A.M.C. v. P.B., 447 N.J. Super. 402, 416 (App. Div. 2016). Instead, the judge elaborated under the second Silver prong:

> Is there any immediate danger or the need to protect from reoccurrence? Relief in the form of a [FRO] in the [Family Part's] view is not needed to prevent further abuse or controlling behavior. Counseling, anger management, and like services are needed to address the core problems of the parties in relation to each other and their daughter.
>
> So, the [Family Part] does not find that a [FRO] is needed by [plaintiff] with regard to the [Family Part's] finding even though it did find an assault based on reckless conduct, the [Family Part] does not find that it was tainted by any attempt by [defendant] to abuse or control her; but rather to address the situation as it occurred and under circumstances where [plaintiff] has certainly exacerbated the circumstances as well . . . . [T]he [Family Part] perceives no immediate danger to [plaintiff].

This conclusion is supported by substantial, credible evidence in the record that defendant's backhanded push of plaintiff occurred while he tried to escape plaintiff's second attack upon him. See, e.g., N.T.B. v. D.D.B., 442 N.J. Super. 205, 224 (App. Div. 2015) (finding wife would be entitled to a self-defense justification for hitting her husband if she did so in order to flee from him).

A-3638-21

Therefore, the judge properly analyzed the second <u>Silver</u> prong and did not abuse his discretion in denying plaintiff's request for an FRO.

Moreover, plaintiff's reliance on <u>A.M.C.</u> is misplaced. There, the Family Part judge held an FRO was needed where the husband was blatantly violent towards the wife—he physically assaulted her to prevent her from seeking refuge in a women's shelter and verbally threatened her with further violence. The husband said (1) "he would make [her] life hell"; (2) he "can harm [her] whenever he wants"; and (3) he "can hurt [her] whenever he feels like it." <u>Id.</u> at 757-58. In contrast to <u>A.M.C.</u>, here the judge made a factual finding, supported by the police officers' assessment, that plaintiff was twice the aggressor and defendant was twice the victim. The record shows plaintiff was interviewed and observed by the police officers for over two and a half hours, and not "less than five minutes" as she contends.

We also reject plaintiff's contention that the judge "prejudged the case." On the contrary, the judge stated, "The West Windsor investigation was not controlling on the [Family Part]. All of the evidence with regard to their involvement was used by the [Family Part] to again assess timely responses or explanations for what had occurred and it was helpful [in] that regard." And, the record shows the judge originally scheduled two days for the trial, but as the

matter progressed, the judge afforded plaintiff ample time and opportunity to present further testimony and exhibits. The judge's comprehensive decision weighed all of the facts and evidence with great detail, and he did not prejudge the case.

The judge found "each party had the ability to know what they were talking about . . . [because] it was their own personal experience . . . [and] [t]he trauma from the event did not prevent either from talking cogently about the events on the day of and at the time of the trial." Plaintiff argues the judge erred in considering the most contemporaneous accounts the most credible. We reject plaintiff's argument because the judge reviewed the entire record in making his credibility determinations.

Finally, the judge found "[t]here were multiple contradictions on matters of importance." The judge highlighted some examples of contradictions, such as whether the events on July 27 were an accident, and highlighted that the "[a]ccounting of events changed. Details were added through the time of trial." The judge's conclusion that the parties engaged in mutual assaults and that FROs were not needed to protect them from future acts of domestic violence was well supported by the record. We agree with the judge's conclusions that the PDVA addresses matters of domestic violence, not domestic contretemps.

In fact, the judge carefully assessed the parties' respective credibility by referring to some of the credibility factors found in the Model Civil Jury Charge: (1) whether the witness has an interest in the outcome of the case, (2) how good and accurate is the witness' recollection, (3) the witness' ability to know what he or she is talking about, and (4) whether there were any contradictions or changes in the witness testimony.

The judge assessed credibility applying these four factors. First, the judge found both parties had an interest in obtaining an FRO, and also found any expressed interest on the need for protection is stronger for plaintiff than defendant. Second, because eight months had elapsed between the July incident and the trial, the judge noted the parties' later recollections were diminished and therefore found their accounts closest in time to the event "most reliable." Third, the judge highlighted "[b]oth parties' testimony at trial was marked by answers of 'Do not recall, request to see transcripts, or other documents or videos to refresh recollection,' even for the testimony given fairly recently within weeks, or even the same day." Fourth, instances of the parties lacking understanding during "simple-straight forward questions" and leaving out "details in their statements to the officers on the scene in July that were later included or misrepresented" were also noted by the judge. As emphasized by the judge, the

parties have gone their separate ways and thus, there is no "immediate danger" for which the issuance of an FRO would be "self-evident."  Silver, 387 N.J. Super. at 127.

To the extent we have not addressed plaintiff's other arguments, it is because they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3638-21