# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2751-22

M.L.,

    Plaintiff-Respondent,

v.

K.B.,

    Defendant-Appellant.

_____

          Submitted April 23, 2024 – Decided April 30, 2024

          Before Judges Gooden Brown and Haas.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-1876-23.

          Lomurro, Munson, LLC, attorneys for appellant (Joshua E. Maze, on the brief).

          Respondent has not filed a brief.

PER CURIAM

Appellant K.B.[1] appeals from a March 28, 2023 final restraining order (FRO) entered in favor of respondent M.L. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Because the trial court made insufficient credibility findings and failed to properly evaluate the proofs under the standards enunciated in Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006), we vacate the FRO and remand for further proceedings.

K.B. and M.L. had been in a dating relationship, which ended in May 2022. On February 15, 2023, K.B. filed a complaint seeking the entry of a Temporary Restraining Order (TRO) against M.L. after he allegedly threw a rock through the front window of her home. Eight days later, on February 23, 2023, M.L. filed a complaint seeking a TRO against K.B. for allegedly making terroristic threats against him. The two matters were consolidated for trial.

On March 28, 2023, both parties appeared for trial. At that time, K.B. asked for permission to amend her complaint to include an extensive past history of prior acts of domestic violence that M.L. allegedly committed against her.

The trial court did not ask K.B. to provide details concerning this history on the record. Had the court done so, it would have learned that the parties' two complaints were inextricably linked together. K.B.'s later amended complaint

_____

[1] We use initials to identify the parties in accordance with Rule 1:38-3(d)(10).

revealed, among other things that M.L. stabbed K.B. in the back of her neck on June 11, 2022. Defendant later pled guilty to an assault charge and was in jail for approximately five months. He was released shortly before the predicate acts described in the parties' respective complaints. Indeed, in the amended complaint, K.B. alleged that M.L. filed his complaint "as a form of retaliation and revenge" against her for bringing charges against him.

Unlike the standard practice in these matters, the trial court did not briefly excuse the parties to allow K.B. to include the amendments in her complaint so that M.L. could review them that same day. At that point, the court would discuss the matter with the parties and determine whether an adjournment was necessary to enable defendant to marshal the evidence necessary to meet the new allegations. If that was the case, the court would move the trial to a new date. However, if both parties were satisfied they could proceed, the trial could continue.

Here, the trial court did not follow this procedure. Instead, the court immediately adjourned the trial on K.B.'s complaint and scheduled it for a new date. Noting that M.L.'s complaint involved an incident that allegedly occurred on "a different date," the court determined that his complaint could still be tried as scheduled.

3

The court's decision had immediate adverse ramifications for K.B. because the court would later rule that it could not consider M.L.'s past history of domestic violence against her because it was not listed in M.L.'s complaint. The court asked the parties, who were not represented by attorneys, if they were ready to proceed, and they stated they were.

A short trial followed.  M.L. testified that after he was released from jail on the assault charge, there was a "no contact order" in place against him in K.B.'s and her daughter's favor.[2]  He stated that he had been attempting to get a restraining order against K.B. since January 28, 2023, but had been unsuccessful.  His complaint indicated that his requests for TROs had been denied "several times" during this period.  The court did not ask M.L. any questions about his attempts to obtain TROs or why they were denied.

As for the predicate offense, the court stated that M.L.'s complaint "allege[d] that there was an incident that took place on February 23, 2023 at approximately 12:23 a.m." and asked him what happened at that time.  M.L. claimed that K.B. came to his house driving a silver minivan.  He looked out the second floor window of his home and saw four men in the minivan and all of

_____

[2] M.L. was originally attempting to assault K.B.'s daughter.  K.B. got between them and M.L. stabbed her in the neck.

them had guns. M.L. said K.B. and the men "kept calling his name out the window, talking about we know you up there, this and that, come outside." He also stated they told him to "[c]ome outside so they could F [him] up."

Although he told the court that this incident began after midnight, he also stated, "I don't remember the time. It was in the afternoon - - I mean the afternoon - - evening." Later, M.L. testified during K.B.'s cross-examination that "[t]his was around like 5:00 - - between 5:00 and 6:00 when - - I'm not sure like what's the exact time." He was also unclear how long the incident lasted. He told K.B. on cross-examination that it was "[l]ike a couple of minutes - - like seven minutes - - five minutes."

M.L. stated he called the police and filed a report. Other than his TRO complaint, however, M.L. did not introduce a copy of the report at the trial and the court did not ask him if the police conducted an investigation of the alleged incident. M.L. also did not use his phone to photograph or record K.B. or the four armed men he claimed were at his home.

M.L. testified that K.B. was a gang member. When K.B. asked him why he said this, M.L. explained that he knew K.B. was in a gang because she lived on a particular street. Although M.L. admitted he did not know any of the men

who allegedly accompanied K.B. to his home, he also asserted they were gang members.

M.L. admitted that K.B. did not own a silver minivan. He did not obtain the license number of the vehicle he allegedly saw that night.

During her testimony, K.B. denied any involvement in the incident. She said she did not see M.L. at any time on February 23, 2023. K.B. also told the court that she "wish[ed] [she] could pursue with my domestic violence case so you could see my history of domestic violence[.]" The court did not respond to this request.

M.L. wrote in his complaint that "both parties have previous domestic violence history." The trial court asked M.L. to explain this entry.

In response, M.L. did not assert that K.B. had ever committed an act of domestic violence against him. Instead, he stated that the parties' history consisted solely of the incident where he "went away for aggravated assault - - for bodily injuries that was false." M.L. explained that the charges were "false" because it was actually K.B.'s daughter who "cut her." M.L. stated that K.B. wanted to protect her daughter, so she told the police that he assaulted her. M.L. alleged that he "took a plea" on that charge so he could "get home" from jail.

A-2751-22

K.B. attempted to ask M.L. about the domestic violence he committed against her that would later appear in her amended complaint. However, the trial court did not allow her to do so after M.L. claimed there were no other incidents.

At the conclusion of the hearing, the trial court rendered a very brief oral opinion. After providing a short summary of each party's testimony, the court found that M.L. "met his burden of proof by a preponderance of the evidence." The court based this conclusion on the following findings:

> [M.L.] testified clearly and credibly that an incident . . . that involved terroristic threats by [K.B.] against him did, in fact, take place on February 23, 2023.
>
> He described the minivan, the location of where it was parked and the four gentlemen that were with [K.B.]

The court made no credibility findings concerning M.B.'s testimony.

Turning to the second prong of the Silver test, the trial court stated:

> Based on [M.L.'s] testimony , . . . the [c]ourt does find that there is an immediate danger to [M.L.] if a [FRO] is not entered and, therefore, there will be a [FRO] entered in this matter against [K.B.]

This appeal followed.[3]

---

[3] On June 26, 2023, we granted K.B.'s motion to supplement the record with information concerning the outcome of her complaint against M.L. On April

On appeal, K.B. contends the trial court "made incorrect assumptions about the impact of bifurcating the proceedings" and that its "finding of the predicate act of terroristic threats was unsupported by substantial, credible evidence."

Our scope of review in these matters is well-established. "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

---

25, 2023, a different judge conducted a trial on K.B.'s complaint against M.L. M.L. did not appear. The judge expressed concern about why the two cases had not been heard together, but took testimony from K.B., who testified that M.L. had broken her window and a mirror when he threw rocks at her home. K.B. also provided the judge with the history of domestic violence that she was barred from presenting in the trial on M.L.'s complaint. In addition to the aggravated assault we have already discussed, K.B. testified that on other occasions, M.L. kicked in her door, "busted out" her car windows, and entered her home without permission. At the end of the trial, the judge concluded that K.B. was "entirely credible" and granted her request for a FRO against M.L. The judge also added K.B.'s daughter as a protected party under the FRO.

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). Thus, we will not disturb a trial court's factual findings unless "'they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to the trial court's purely legal conclusions, which we review de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-step analysis delineated in Silver, 387 N.J. Super. at 125-27. First, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)).

Terroristic threats are among the predicate acts that constitute domestic violence. N.J.S.A. 2C:25-19(a)(3). The crime of terroristic threats occurs when a person "threatens to commit any crime of violence with the purpose to terrorize another" or "threatens to kill another with the purpose to put him in immediate

fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out." N.J.S.A. 2C:12-3(a) and (b). "The pertinent requirements are whether: (1) the defendant in fact threatened the plaintiff; (2) the defendant intended to threaten the plaintiff; and (3) a reasonable person would have believed the threat." Cesare, 154 N.J. at 402.

Under the second Silver prong, if the court finds that the defendant committed a predicate act of domestic violence, the court must then determine whether it "should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126. In those cases where "the risk of harm is . . . great," J.D. 207 N.J. at 488, the second inquiry "is . . . often perfunctory and self-evident," Silver, 387 N.J. Super. at 127. See A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016) ("When the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" (quoting Silver, 387 N.J. Super. at 127)). However, in all cases, "the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

Under N.J.S.A. 2C:25-29(a),

> [t]he court shall consider but not be limited to the following factors:
>
> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) [t]he existence of immediate danger to person or property;
>
> (3) [t]he financial circumstances of the plaintiff and defendant;
>
> (4) [t]he best interests of the victim and any child;
>
> (5) [i]n determining custody and parenting time the protection of the victim's safety; and
>
> (6) [t]he existence of a verifiable order of protection from another jurisdiction.

In rendering a decision, the trial court is required to make specific findings of fact and state its conclusions of law. R. 1:7-4(a); see also Elrom v. Elrom, 439 N.J. Super. 424, 443 (App. Div. 2015) (requiring an adequate explanation for the basis of a court's action). "Failure to make explicit findings and clear statements of reasoning 'constitutes a disservice to the litigants, the attorneys, and the appellate court.'" Gnall, 222 N.J. at 428 (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)).

Moreover, "[m]eaningful appellate review is inhibited unless the [court] sets forth the reasons for [its] opinion." N.J. Div. of Child Prot. & Permanency v. T.S., 463 N.J. Super. 142, 168 (App. Div. 2020) (quoting Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990)). Thus, although our standard of review is generally limited in this area, where inadequate fact findings are made or where issues are not addressed, we are constrained to remand for further proceedings. See Gormley v. Gormley, 462 N.J. Super. 433, 449 (App. Div. 2019) ("'The omission of critical factual findings . . . requires a remand limited to this issue.'" (quoting Elrom, 439 N.J. Super. at 443)).

Applying these principles, we conclude the trial court failed to make specific credibility findings in accordance with Rule 1:7-4 to properly conduct the requisite Silver analysis. See Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 1:7-4 (2024) (noting Rule 1:7-4(a) "requires specific findings of fact and conclusions of law"). Although the court stated that M.L. "testified clearly and credibly," it did not explain the basis for this finding other than stating that M.L. "described the minivan, the location of where it was parked and the four gentleman that were with" K.B. The court did not even mention M.L.'s demeanor and behavior on the witness stand. The mere fact that a witness

12

was able to describe a vehicle, its location, and claim there were four men in it is insufficient support for a credibility finding.

The court also did not consider the many inconsistent statements M.L. made at trial. For example, he was not sure when the alleged incident occurred, and variously stated that it happened in the afternoon, between 5:00 p.m. and 6:00 p.m., or after midnight. He could not say how long K.B. was outside his home with the four men. He claimed K.B. and the men, who he could not identify, were gang members solely because K.B. lived on a particular street.

M.L. claimed he had previously sought to obtain TROs against K.B. after his release from jail, but had been unsuccessful. The court did not ask him why he sought those orders or why the judges denied them.

Perhaps most significantly, M.L. claimed he lied under oath during his plea hearing when he pled guilty to the aggravated assault charge that led to his jail sentence. The court did not explain how M.L.'s claim that he previously violated his duty to tell the truth in a court proceeding factored into its determination that he was credible in this case. The court also failed to make any specific credibility findings concerning K.B.'s testimony.

Nor did the court explain why it did not consider the parties' full prior history in analyzing the case. See N.J.S.A. 2C:25-29(a)(1) (requiring the court

13

to consider "[t]he previous history of domestic violence between the plaintiff and defendant"). As noted above, the parties' two complaints should have been considered together during a single trial. In that fashion, the court would have obtained a complete picture of their interactions. At the very least, once M.L. claimed that the aggravated assault he committed against K.B. was the only past instance of domestic violence during their relationship, the court should have granted K.B.'s request to bring in the other past history to rebut M.L.'s claim. Based upon these obvious deficiencies in the court's analysis, the FRO cannot stand under the first prong of Silver.

The trial court was also required to make specific findings as to whether restraints were necessary to "protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 126-27. On this point, we agree with K.B. that the trial court's findings concerning the second Silver prong were insufficient.

The court made only a conclusory finding "that there is an immediate danger to [M.L.] if a [FRO] is not entered . . . ." The court did not provide detailed findings concerning M.L.'s testimony or the lack of any past history of domestic violence on K.B.'s part against M.L. Indeed, the only testimony the

court permitted on the issue of past history concerned the aggravated assault M.L. committed against K.B.

Because our review is hampered by the trial court's failure to make sufficient credibility findings as required by Rule 1:7-4 as well as the court's incomplete evaluation of the second step of the Silver analysis, we are constrained to vacate the FRO, reinstate the complaint and the TRO, and remand the matter for a new trial. Because the judge who conducted the March 28, 2023 trial may have a commitment to the limited findings in the record, the new trial should be conducted by a different judge. See N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 617 (1986) ("Because the trial judge has heard this evidence and may have a commitment to its findings, we believe it is best that the case be reconsidered by a new fact-finder.");

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2751-22