# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2528-23

C.A.B.,

    Plaintiff-Respondent,

v.

L.M.,

    Defendant-Appellant.

_____

Argued November 19, 2025 – Decided March 4, 2026

Before Judges Smith and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FV-14-0286-24.

Michael Garcia argued the cause for appellant (Fernandez Garcia, LLC, attorneys; Michael Garcia, of counsel and on the briefs).

Donald T. Bonomo argued the cause for respondent (Perez and Bonomo, attorneys; Donald T. Bonomo, on the brief).

PER CURIAM

Defendant, L.M.,[1] appeals from the March 15, 2024, final protective order ("FPO") entered against him in favor of plaintiff C.A.B. under the Victim's Assistance and Survivor Protection Act ("VASPA"), N.J.S.A. 2C:14-13 to – 21. The FPO stemmed from three incidents of nonconsenual sexual contact or attempted sexual contact by L.M., C.A.B.'s supervisor. Having considered the record and the applicable legal principles, we affirm.

I.

The following facts are taken from the plenary hearing that took place over six trial days between October 3, 2023, and March 15, 2024.

C.A.B. worked as a cleaner for Delta Building Services ("Delta") and was assigned to the Givaudan Flavors facility. At the time of the incidents, C.A.B. was employed by Delta for approximately five years, with L.M. acting as her supervisor for the last two.

C.A.B. applied for her position at Delta under the alias "Valerie Alvarez" and presented false identification and a social security card bearing that name. C.A.B. continued to work under that pseudonym for approximately five years and reapplied to Delta in April 2022 using her correct name and government identification.

---

[1] We use initials to protect the parties' confidentiality under Rule 1:38-3(c)(12).

Delta paid C.A.B. electronically. Each pay cycle required an employee to complete a bilingual three-question survey on the employee portal:

1. I have reviewed my paystub and the hours and the amounts are correct for this pay period.

_____Agree                              _____Disagree

2. I am not being sexually or otherwise harassed in the workplace.

_____Agree                              _____Disagree

3. Delta Building Services provide a safe work environment on a daily basis.

_____Agree                              _____Disagree

Employees would not receive their pay until the survey was completed. C.A.B. admitted answering the first question every time she was paid. However, she denied answering the remaining two. C.A.B. never notified Delta nor Givaudan that she had been sexually harassed by anyone in the workplace.

C.A.B. alleged that L.M. had made sexual contact or had attempted to make sexual contact with her on three occasions. First, she claimed that in a staff meeting during the summer of 2022, L.M. sat next to her and suddenly grabbed her inner thigh and groin area under a conference room table. She testified she did not report this incident to anyone, including Rochelle

3

Richardson, the Givaudan maintenance coordinator and supervisor of the Delta workers. Richardson testified that, during weekly meetings held in a conference room, employees always sat in the same seats, with C.A.B. and L.M. at opposite ends of the table. They never sat next to each other.

Second, C.A.B. testified that on or about May 31, 2023, she received a text message from "Givanni Delta" instructing her to go to Building 5 and open a janitorial closet. While she could not confirm L.M. sent that text, she claimed that when she opened the closet, L.M. followed her into the closet. He then asked if he could touch her breasts, and then attempted to do so. She refused and left the closet without reporting the incident.

L.M. denied both allegations, testifying that he neither sat next to C.A.B. at staff meetings nor did he ever enter a supply closet with C.A.B. nor did he ever touch her inappropriately. In addition, Richardson testified that C.A.B. never complained of any inappropriate conduct during weekly meetings and that she had been reprimanded for taking excessive breaks.

Third, on or about July 19, 2023, when C.A.B. twisted her ankle at work, L.M. drove her for treatment to a clinic. No sexual comments nor touching allegedly occurred on the way to that facility. When the clinic declined to treat C.A.B. without paperwork, L.M. took her to Walgreens for over-the-

4

counter medication. While C.A.B. applied the medicine, L.M. went into a nearby store for several minutes. When he returned, C.A.B. alleged that L.M. offered to take her to a hotel, made sexual comments, and grabbed her upper hip/leg area. C.A.B. refused L.M.'s advances. L.M. then drove her back to the job site and C.A.B. returned home. On the same day, L.M. accompanied her to an urgent care appointment in Cedar Knolls and entered the examination room with her.

C.A.B. reported her allegations to coworker Jorge Rodriguez on July 28, 2023, and Rodriguez prepared a statement for human resources. The statement, however, did not explicitly reference any physical contact. On August 1, 2023, C.A.B. reported the incident to the police.

Later, L.M. learned that C.A.B. was taking hour-long breakfast breaks and two hour-long lunches. L.M. also received complaints that C.A.B. was not performing her maintenance duties. L.M. was instructed to give C.A.B. a written warning, and to limit all employees' breaks, including C.A.B.'s.

C.A.B. filed for a temporary protective order ("TPO") against L.M. under VASPA predicating the request on these three incidents and the matter proceeded to a trial.

A-2528-23

Over six, non-consecutive trial days, C.A.B., L.M., and various witnesses, including Richardson, Rodriguez, and L.M.'s wife, V.D. testified.

Ultimately, the trial judge court granted the relief sought by C.A.B. and entered an FPO against L.M. on March 15, 2024. In an oral opinion, the judge found:

> Now, here these two folks [] they work at a company locally. . . . And we go back in time, and, again, we've had lots of testimony about all kinds of stuff. You know really, I -- I look at what is alleged and what has been proven you know. And you know nobody's testimony is ever going to be perfect in a case. That would really kind of make everyone scratch their head if things were so perfect, because people's recollections do fade and -- and not.
>
> . . . .
>
> You know neither one of these parties strike me as being overly fragile. They seem like they're pretty sturdy tough individuals. But a person has to understand when another person is saying no, I'm not interested you know it doesn't matter. Because we heard some testimony of how people dress when they . . . [they]'re going to work. I don't care if you show up at work with barely nothing on. You do not have the right to comment or -- or touch another person, obviously, without their consent.
>
> [T]his is a superior and a subordinate . . . which in the employment world . . . is also something that I must take into consideration, because it goes to a person's likelihood or not likelihood of complaining about that

person initially, when they're worried about their job . . . .

And, again, we heard from [L.M.] in this regard, he denies it. You know [L.M.]'s position basically is overall to deny or minimize what happened. He denies totally that this happened in the closet.

. . . .

And we heard from various other witnesses. Rochelle Richardson, she did not recall the seating arrangements as [C.A.B.] testified to. Jorge Rodriguez, who I found to be a good witness . . . .

But we also see emails such as P-8, which were from July of 2023, and [C.A.B.] was claiming that she was being sexually harassed at work. And her testimony was that if she didn't go along with it, she felt that she might be fired. There was also some reference to perhaps being grabbed on another occasion.

. . . .

[L.M.] denies he ever even would stare at [C.A.B.] He denies that he ever was in [the] supply closet with her. And that's where I started to lose my sense of credibility in some of what [L.M.] was saying.

. . . .

[B]ut I do find that [L.M.] did make contact with [C.A.B.] in her genital area at least in the car. He grabbed her leg under the table at a minimum, but . . . the criminal sexual contact was when he touched her in the car, offered to take her to a hotel room. The [c]ourt finds that it's more likely than not, based upon the evidence before it that that, in fact, happened.

It also appears to the [c]ourt that it is more likely than not that while they were in this supply closet that he made a lewd comment to her about her breasts and her buttocks, but that he also attempted to touch her in that area. [T]hat's not criminal sexual contact, but it is an attempted contact, and that's what was set forth in the [the statute]. It was attempted sexual contact, as well as sexual contact. The [c]ourt finds that the statutes have been satisfied for criminal sexual contact.

. . . .

And they work in the same company. I am concerned about not vigilantism, but what do you want to call it in making somebody's life difficult. I find that there's a need to have a continued order of no contact between the parties. Primarily, again, I find that there was an intentional touching of [C.A.B.] over her clothing in her intimate areas, and that [L.M.] was doing that with the purpose of gratifying himself. And that is evidenced by the fact that he had offered to go to a hotel room with her to have sex. That clearly shows the [c]ourt that he was trying to fulfill his request for sexual gratification.

Even in the [] the coatroom, but in the supply closet. Again, it appears that this was [d]one in an effort to satisfy hi[mself] or arouse his sexual gratification needs. I don't think [L.M.] was doing it to degrade [C.A.B.]. I think he was . . . trying to engage her, but you can't do that without a person's consent, it's inappropriate, it's wrong. And when a person says no on May 31st, then we should not have any of these subsequent events even being discussed. No means no.

8

The trial judge issued an FPO that included provisions for no contact, stalking, or surveillance. It also included a condition barring L.M. from working during any shift when C.A.B. was on site.

L.M. appeals and raises three issues for our consideration:

Point I.

[C.A.B.] failed to meet the threshold requirements of N.J.S.A. 2C:14-16(a) and therefore the court erred in granting the final protective order.

Point II.

The court erred in considering [L.M.]'s unrelated and dismissed temporary restraining orders as prior bad acts and [] using those prior bad acts to assess the witnesses' credibility.

Point III.

[L.M.] was denied a fair hearing as a result of the trial [judge]'s cumulative errors.

II.

In Family Part matters, we defer to a trial judge's factual findings "when supported by adequate, substantial, credible evidence." C.R. v. M.T. (C.R.II), 257 N.J. 126, 139 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "That deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v.

MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare, 154 N.J. at 412). Consequently, we will preserve a trial judge's factual findings "unless they 'went so wide of the mark that a mistake must have been made.'" Ibid. (quoting DYFS v. M.M., 189 N.J. 261, 279 (2007)). Although we defer to a trial judge's legal conclusions, we will not interfere with "the factual findings and legal conclusions of the trial [judge] unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," or we "determine the [trial judge] has palpably abused [his or her] discretion." Parish v. Parish, 412 N.J. Super. 39, 47 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412).

VASPA allows survivors of sexual assault incidents who cannot seek restraining orders under the Prevention of Domestic Violence Act of 1991 ("PDVA"), N.J.S.A. 2C:25-17 to -35, to seek temporary and permanent civil protective orders. C.R. v. M.T. (C.R. I), 248 N.J. 428, 441 (2021). Specifically, "[a]ny person alleging to be a victim of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct," who is not eligible for a restraining order as a "victim of domestic violence" under

10

the PDVA, may apply for a protective order under VASPA. N.J.S.A. 2C: 14-14(a)(1), -16

Under that statute, at an FPO hearing, a plaintiff must prove the allegations under a preponderance of the evidence. N.J.S.A. 2C:14-16(a). A court may issue an FPO only after finding:

> (1) the occurrence of one or more acts of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct . . . against the alleged victim; and
>
> (2) the possibility of future risk to the safety or well-being of the alleged victim.
>
> [Ibid.]

A court may not deny an FPO because of the "alleged victim's failure to report the incident to law enforcement; the alleged victim's or the respondent's alleged intoxication; whether the alleged victim did or did not leave the premises to avoid [the] nonconsensual sexual contact . . .; or the absence of signs of physical injury to the alleged victim." N.J.S.A. 2C:14-16(b). Any "evidence of the alleged victim's previous sexual conduct or manner of dress at the time of the incident shall not be admitted" in any FPO proceeding. N.J.S.A. 2C:14-16(c).

## A.

L.M. argues that C.A.B. failed to meet the threshold requirements under N.J.S.A. 2C:14-16(a) and claims the trial judge erred in granting the FPO. He primarily disputes the trial judge's factual findings and adverse credibility determinations. Additionally, L.M. asserts that even if C.A.B. proved a predicate act, satisfying the first prong of the statutory test, she failed to meet the second by not demonstrating a future risk to her safety or well-being. We disagree.

## 1.

Our review of the record reveals the trial judge correctly found L.M. engaged in actual and attempted nonconsensual sexual contact against C.A.B. and this was sufficient evidence to establish the first prong of the statutory test to obtain an FPO. N.J.S.A. 2C:14-16a(1). "Sexual contact" is "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." N.J.S.A. 2C:14-14(a)(1). "Intimate parts" include "the following body parts: sexual organs, genital area, anal area, inner thigh, groin, buttock or breast of a person." N.J.S.A. 2C:14-1(e). A review of the record supports the trial judge's

12

conclusion that there was sexual contact and that it was nonconsensual.

First, the record is replete with testimony that L.M. attempted to, and touched C.A.B.'s hip area and groin.  The evidence supports her complaints that L.M. targeted precisely those body parts that the legislature enumerated in N.J.S.A. 2C:14-1(e).  As the trial judge correctly concluded, "[a] person who grabs somebody's intimate areas by definition sexual contact can be touching somebody's genital area, even if it's outside of the clothes.  You don't have to expose yourself to have criminal sexual contact."

These conclusions were supported with the trial judge's favorable credibility determinations of C.A.B., and adverse observations about L.M. The trial judge acknowledged the testimony to be "a lot of . . . she said, he said" and the judge  "heard things back and forth that affect peoples' credibility."  Nevertheless, the trial judge pointed to specific testimony that led him to conclude C.A.B. was more credible in her testimony, than that presented by L.M.  The judge stated he "started to lose [his] sense of credibility in some of what [L.M.] was saying" when he was simply denying he would ever stare at C.A.B. and that he denied ever being in the supply closet with her.  The following exchange buttresses the judge's finding of C.A.B. being more credible than L.M.:

Q:      There was an incident that [C.A.B.] talked about in the closet. Do you remember that incident?

L.M.: Can you repeat that?

Q:      There was an incident [C.A.B.] spoke about her going into a supply closet.

L.M.: Okay.

Q:      Can you talk to me about that incident?

L.M.: But I don't know what she's talking about that I was in a closet with her. I was never in a closet with her.

Q:      Did you ever go into a supply closet with her?

L.M.: Once, but not on that date.

In addition, C.A.B.'s co-worker, Rodriguez, corroborated C.A.B.'s assertion that L.M. engaged in sexual contact as defined by N.J.S.A. 2C:14-1(d). Rodriguez testified in detail about the emotional distress C.A.B. demonstrated to him immediately after the incidents, and about C.A.B.'s contemporaneous disclosures, which tracked her in-court testimony as to the nature and location of the unwanted touching by L.M.

These incidents were sufficient for the trial judge to conclude: "[I]t[] [was] more likely than not, . . . that [the sexual contact when C.A.B. and L.M. were in the car], in fact, happened"; and "it [was] more likely than not that

A-2528-23

while they were in [the] supply closet . . . that he [] attempted to touch her in [breasts and buttocks] area." As a result, the trial judge correctly found "attempted contact" and "sexual contact" occurred by a preponderance of the evidence.

2.

The second prong requires the trial judge to "consider the possibility of future risk to the safety or well-being on the alleged victim." N.J.S.A. 2C:14-16(a)(2). Despite the fact that L.M. asserts C.A.B.'s transfer to a different office eliminated any risk of future harm, the evidence supports the trial judge's conclusions that the risk to C.A.B. exists notwithstanding the new assignment of the parties. To satisfy the second prong of the statutory test, C.A.B. must prove an FPO is necessary to protect her against the "possibility of future risk to [her] safety or [her] well-being . . . ." Ibid.

The Supreme Court interpreted this language in C.R. II. VASPA "does not define the words possibility, risk, safety, or well-being," the Court noted these terms must be given their "'generally accepted meaning, according to the approved usage of the language.'" C.R. II., 257 N.J. at 145 (first quoting N.J.S.A. 2C:14-16(a)(2); and then quoting N.J.S.A. 1:1-1). Therefore, the Court turned to dictionary definitions to determine the meaning of subsection

15

(a)(2). <u>Id.</u> at 145-46. According to the Court, the statute's use of the word "possibility" merely "requires a chance that something may happen or be the case," and that "risk" meant "the possibility that something unpleasant or unwelcome will happen." <u>Id.</u> at 145-46. The Court concluded the term "well-being" to mean "a state of being comfortable, healthy, or happy." <u>Id.</u> at 146 (internal quotation marks omitted). Considering these definitions in light of the statutory language, the Court found that the Legislature purposely created "a lenient and easy-to-satisfy standard" compared to the PDVA, since even the possibility of exposure to "something emotionally unwelcome or unpleasant that could make [a victim] feel uncomfortable, unhealthy, or unhappy" and would, therefore, satisfy the statutory test. <u>Id.</u> at 146-47. According to the Court, a plaintiff's perceived risks to her safety or to her emotional well-being justified issuing the FPO. <u>Id.</u> at 147-49. The Court elaborated:

> The plain language of factor two thus requires a court to consider whether there is a chance that a survivor may be exposed to physical danger, risk, or injury, or may be exposed to something emotionally unwelcome or unpleasant that could make them feel uncomfortable, unhealthy, or unhappy. And because the language of factor two is centered on the safety or well-being of the victim-survivor, a survivor's own testimony regarding possible future risks to their safety or emotional well-being can suffice.
> [<u>Id.</u> at 146.]

16

Notably, the Court noted that satisfaction of the first prong of the statutory test is not dispositive and that even once the victim satisfies the first prong, she is not "'automatically entitled to an FPO' under N.J.S.A. 2C:14-16(e)." Id. at 149-50. A court does not have to "ignore the precise forms of trauma that victims of sexual assault are likely to experience when analyzing N.J.S.A. 2C:14-16(a)(2)." Id. at 148. To the Court, the statute's plain language "makes clear that credible testimony about such emotional and psychological harm can be sufficient to satisfy [the statute's] second factor." Ibid. "[N]othing in the plain language of N.J.S.A. 2C:14-16(a)(2) requires a survivor's belief about the possibility of future risk to their safety or well-being to be objectively reasonable." Id. at 149.

Here, three instances of alleged sexual assault took place while L.M. worked as C.A.B.'s supervisor. C.A.B. never consented to any of L.M.'s advances. When specifically asked by the trial judge as to why she sought an FPO, C.A.B. stated she was "fearful" and L.M. was "not the same person." C.A.B. further felt that L.M. was "out to get [her]," and "retaliating against her by not accepting [L.M.]'s advances," and L.M. could have gotten her fired for that.

17

In sum, the evidence presented demonstrates that C.A.B. satisfied the second prong under N.J.S.A. 2C:14-16(a)(2) because she showed an FPO was necessary to protect her against the ongoing possibility of risk to her safety and well-being, regardless of the change in office assignments.

B.

To the extent we have not specifically addressed any of L.M.'s remaining arguments, we deem them without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). We only make this brief observation about L.M.'s second claim of error. We acknowledge the trial judge's sua sponte consideration of the temporary restraining orders ("TRO") formed part of the trial proceedings. Nevertheless, our review of the record demonstrates that, independent of the TROs, the evidence on which the trial judge based his decision was more than sufficient to satisfy the preponderance of the evidence standard for issuing an FPO.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2528-23